31 C.C.P.A.(Patents)

## JOSSERAND v. TAYLOR.

### Patent Appeal No. 4745.

Court of Customs and Patent Appeals.
July 6, 1943.

Rehearing Denied Oct. 4, 1943.

———◆———

Lester B. Clark, of Houston, Tex., and Ray L. Smith, of Salem, Or., for appellant.

Paul & Paul, of Philadelphia, Pa. (John H. Austin and Leonard L. Kalish, both of Philadelphia, Pa., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the subject matter defined in the single count in issue to appellee, Samuel Herbert Taylor, Jr.

The interference is between appellee's application No. 225,682, filed August 19, 1938, and appellant's application No. 301,713, filed October 28, 1939.

■ Appellant is the junior party, and the burden was upon him to establish priority of invention by a preponderance of the evidence.

The count in issue originated in appellee's application. It reads: "1. In a drive-in theater a plurality of inclined parking ramps for elevating the front ends of automobiles parked in said theater, a plurality of inclined drive-over ramps merging with the higher portions of said parking ramps, and a plurality of driveways, each of said driveways merging with the lower portion of one of said drive-over ramps on one side thereof and with the lower portion of one of said parking ramps on the other side thereof."

As will be observed from the quoted count, the invention relates to a so-called "drive-in theater," having a plurality of inclined parking ramps for elevating the front ends of automobiles so that those seated in the automobiles will have an unobstructed view of the screen. The count also calls for a plurality of inclined *drive-over ramps* which merge with the higher portions of the *parking ramps,* and a plurality of driveways each of which merges with the lower portion of one of the *drive-over ramps* on one side and with the lower portion of one of the *parking ramps* on the other side. By such an arrangement, an automobile may be driven forwardly from one parking ramp onto a driveway, or it may proceed directly ahead onto another parking ramp. Stated differently, the arrangement, as defined in the count, is such that an automobile may be driven from the outermost driveway in the theater over the parking ramps and the drive-over ramps to the innermost parking ramp or to the innermost driveway.

The interference was declared on February 27, 1940.

In his preliminary statement, filed March 25, 1940, appellant alleged that he conceived the invention and disclosed it to others on or about July 1, 1933; "That the invention was reduced to practice on or about the month of December, 1933 by the filing of an application for patent embodying the invention *and that since that time actual theaters constructed in accordance with the invention have been made and used."* (Italics ours.)

Appellee alleged in his preliminary statement that he first made a drawing of the invention on February 5, 1937, and a written description thereof on November 26, 1937; that he disclosed the invention to others on March 14, 1937; and that he reduced it to practice by the construction and operation of a theater conforming to the count in issue on May 26, 1938, at Detroit, Michigan.

On December 19, 1939, appellant filed a reissue application, No. 311,064, for the reissue of his patent No. 2,102,718, issued December 21, 1937, on an application filed December 14, 1933. That patent and the reissue application relate to certain improvements in the arrangement and construction of a drive-in theater.

On May 3, 1940, soon after the interference was declared, appellant moved, under rule 109 of the Rules of Practice in the United States Patent Office, 35 U.S.C.A. Appendix, to substitute his reissue application for his application involved in this interference, and to add to the interference proposed counts 2 to 6, inclusive, which were claims in his reissue application. Appellant also moved on that date, under rule 122 of the Rules of Practice in the United States Patent Office, to shift the burden of proof, claiming that his reissue application disclosed the invention defined by the count in issue and that, therefore, he was the senior party.

Appellant's motions were denied by the Primary Examiner on July 19, 1940, the examiner pointing out in his decision that appellant did not disclose either in his patent or in his reissue application drive-over ramps as called for by the count in issue. The examiner also pointed out that the claims proposed to be added as counts to the interference were indefinite, and, accordingly, held them to be unpatentable.

The record contains a decision by the Examiner of Interferences, dated August

17, 1940, in which it is stated that appellant requested reconsideration of the decision of the Primary Examiner denying his motions, hereinbefore referred to, and also moved to add to the interference "newly proposed counts 7 to 12." (It may be said at this point that neither the request for reconsideration of the Primary Examiner's decision, nor the motion to add proposed counts 7 to 12 is in the record.)

In dismissing appellant's motion to add proposed counts 7 to 12, inclusive, the Examiner of Interferences stated that the motion period had expired on May 4, 1940; that the Primary Examiner's decision was handed down on July 19, 1940; that appellant's motion to add proposed counts 7 to 12 was made after the motion period had expired; that the delay in presenting such motion was not adequately explained by appellant; and that the motion contained no statement that the "newly proposed counts are patentable and patentably distinct from the existing count [the count here involved] and from each other," as required by the decision in the case of Ames, Jr., v. Ryan, 1917 C.D. 43. He further stated that the request for reconsideration of the Primary Examiner's decision was being forwarded to the Primary Examiner for proper action in the premises.

The Examiner of Interferences, in a decision dated August 28, 1940, stated that appellant requested reconsideration of his decision of August 17, 1940, dismissing appellant's motion to add proposed counts 7 to 12, inclusive, to the interference. The motion was denied by the examiner for the reasons stated in his decision of August 17, 1940. (Appellant's request for reconsideration is not in the record.)

In a decision dated October 1, 1940, the Primary Examiner reconsidered his decision of July 19, 1940, and again held that appellant's reissue application did not disclose the invention defined by the count in issue. The examiner, accordingly, declined to add to the interference counts 2 to 6, inclusive, hereinbefore referred to.

It appears from the Primary Examiner's decision that in appellant's request for reconsideration it was urged that the count here involved might be clarified in accordance with an amendment suggested by appellant, and that proposed counts 2 to 6, inclusive, might also be clarified as suggested by appellant. What appellant's suggestions were, does not appear of record.

In a decision dated December 5, 1940, the Primary Examiner stated that appellant's request for reconsideration of his decision of October 1, 1940, is granted. Thereafter, in a decision dated March 11, 1941, the Primary Examiner again held that appellant's patent and his reissue application did not disclose the involved invention, and, accordingly, denied appellant's motion to shift the burden of proof. The examiner also again denied appellant's motion to add to the interference proposed counts 2 to 6, inclusive, on the ground that appellant's reissue application did not support the subject matter therein defined.

Thereafter, evidence was submitted by counsel for appellant for the purpose of establishing that appellant reduced the invention to practice by constructing a drive-in theater conforming to the count in issue on a beach at Galveston, Texas, on or about July 5, 1934, and that the theater was operated from July 5 to July 25 of that year when it was destroyed by a storm.

That appellant constructed a drive-in theater on a beach at Galveston, Texas, and operated the same from July 5 to July 25, 1934, is established by the evidence of record.

The only issue with regard to the theater constructed and operated at Galveston is as to its structure and arrangement, it being contended by counsel for appellant that the evidence establishes that appellant's drive-in theater had a plurality of driveways, a plurality of inclined *parking ramps* for elevating the front ends of automobiles and a plurality of inclined *drive-over ramps* as called for by the count in issue. Specifically it is argued that the evidence establishes that appellant had a series of driveways, inclined parking ramps, and inclined drive-over ramps, so arranged that there were two rows of parking ramps and two rows of drive-over ramps between two driveways, with the higher portions of the drive-over ramps merging with the higher portions of the parking ramps and each of the driveways merging on one side with the lower portion of one of the drive-over ramps and on the other side with the lower portion of the parking ramp; and that such an arrangement was made so that those seated in automobiles could have an unobstructed view of the screen, and so that automobiles could be driven forwardly from one parking ramp over a drive-over ramp onto a driveway, or from a parking

ramp over a drive-over ramp onto another parking ramp and, accordingly, from the outermost driveway of the theater over the inclined parking ramps and inclined drive-over ramps to the innermost driveway of the theater.

Appellant Josserand testified that he was an architect, residing in Houston, Texas; that he prepared drawings for a drive-in theater which was constructed on a beach at Galveston, Texas, not later than July 5, 1934, and operated until July 25 of that year, when the theater was destroyed by a storm; that the drawings prepared by him and the theater constructed in accordance therewith conformed to the count in issue; that he contacted T. W. Emenhiser, one of appellant's witnesses, who suggested that he get in touch with the former's cousin, Mr. A. H. Emenhiser, who apparently was a promoter; and that the drive-in theater was constructed by A. H. Emenhiser in accordance with appellant's drawings, which drawings, appellant stated, he was unable to find. Appellant described the theater, in part, as follows: "It was arranged in groups of two parking areas with a driveway and then two additional parking areas and a driveway continuing the depth of the theater and the grading was done out of the natural sand and by grading it up and digging it out in the driveway and between the parking ramps and give the proper height to the ramps, the ramps being steeper in the front of the theater and gradually flattening out toward the rear." He further stated that he had seen automobiles drive over the parking ramps in the Galveston theater; that, although he had constructed that drive-in theater with drive-over ramps, he had never heard the term "drive-over ramp" used until after he had prepared the plans for his involved application; and that so-called "drive-over ramps" were absolutely essential to the operation of the Galveston drive-in theater. He identified appellant's Exhibits Nos. 1 and 7 which are drawings, showing in profile a drive-in theater and having indicated thereon driveways, parking ramps, and drive-over ramps which conform to the count in issue. (Those drawings were made just prior to the submission of appellant's testimony in May, 1941.) The witness also identified a model, appellant's Exhibit No. 3, disclosing the involved invention, which was also made just prior to the taking of his testimony. Other exhibits were identified by appellant but we deem it unnecessary to describe them here.

Appellant's witness T. W. Emenhiser, a contractor at Houston, Texas, stated that he introduced his cousin A. H. Emenhiser to appellant sometime the latter part of 1933; that prior to the construction of the theater in Galveston, appellant had shown him drawings and blue prints of a drive-in theater, similar, except possibly for "different inclinations in the terraces," to appellant's Exhibit No. 1; that a drive-in theater was constructed on the beach at Galveston, sometime in the summer of 1934; that it conformed generally to the arrangement disclosed in appellant's Exhibit No. 1; that there were mounds or terraces "to elevate the front ends of the cars"; that an automobile parked in the rear of the theater could be driven forwardly over the parking ramps and take the place formerly occupied by another car on another parking ramp; that the theater was so arranged that it had a series of driveways and parking places; that there were two rows of parking places between two driveways.

Appellant's witness Richard Townsend, a longshoreman of Galveston, Texas, stated that he helped his brother, the witness Joseph W. Townsend, Sr., build a screen and a "ticket house" for appellant's theater constructed at Galveston, and also helped in grading the sand; that the theater was constructed on the beach at Galveston in the summer of 1934; that ramps, about 14 inches in height, were constructed so as to permit the front ends of automobiles to be elevated; that the parking ramps were so arranged that automobiles could be driven forwardly over them; that the sand of which the ramps were made was wetted down each evening before the show; and that, because the sand would dry out and the wind would blow it around, it was necessary to regrade the ramps about every day or two.

The witness Joseph W. Townsend, Sr., testified that he built an open-air theater on a beach at Galveston, Texas, for A. H. Emenhiser the latter part of June, 1934, and that his brother Richard Townsend worked with him in the construction of the theater. The witness stated that, in addition to the screen, a ticket booth, and benches, the drive-in theater comprised a series of driveways, between two of which were two rows of parking ramps inclined so that the front wheels of automobiles parked thereon would be higher than the rear wheels; that the parking ramps were so arranged that an automobile might be-

driven onto and over them in a forwardly direction from a driveway, or, if it was desired, the driver could back onto a parking ramp from the same driveway; and that an automobile could be driven forwardly from one parking ramp to another. The witness was shown appellant's Exhibit No. 3, which consists of a model showing the arrangement of the driveways, parking ramps, and drive-over ramps as called for by the count in issue, and stated that it was a good representation of the driveways, parking ramps, and curved tops of the parking ramps in the Galveston theater; that no wooden or other protective structure was used to preserve the parking ramps; that the sand terraces were graded nearly every day and were wetted down; and that the theater was in operation every day after it was finished until about July 25, 1934, when it was destroyed by a storm.

Appellant's witness William Grace testified that appellant's drive-in theater was constructed on the beach at Galveston, Texas, right near his place of business. It is unnecessary that we discuss the testimony of the witness Grace except to say that it corroborates the testimony of appellant and his other witnesses as to there being parking ramps so designed that the front wheels of an automobile parked thereon would be elevated; that the automobile could be driven over such ramps; and that he stated that appellant's Exhibit No. 3 showed the arrangement of appellant's theater.

It appears from the record that the time for appellant to submit testimony in chief expired May 28, 1941; that on May 31 of that year, counsel for appellant wrote to counsel for appellee, stating that he had found two drawings in his office files which appellant had made in 1934 and also a building permit which was issued for the building of a theater at Houston, Texas, and requesting counsel for appellee to stipulate that the drawings and building permit might be introduced in evidence. The request was refused. Thereafter, on June 23, 1941, counsel for appellant gave notice to counsel for appellee of the submission of additional testimony on behalf of appellant, which notice was not accepted by counsel for appellee. On July 1, 1941, counsel for appellant submitted evidence, including the drawings and the building permit, hereinbefore referred to, which were introduced in evidence as appellant's Exhibits 12, 13, and 14, respectively.

Counsel for appellee moved to strike the evidence so taken.

Appellant having failed to move to reopen the case for the purpose of taking additional testimony, the Board of Interference Examiners refused, and rightly so, to consider appellant's Exhibits 12, 13, and 14. Quaker Oil Co., Inc. v. Quaker State Oil Refining Co., 74 F.2d 553, 22 C.C.P.A., Patents, 849, 856.

Appellee's witness Andrew J. Warren testified that he was a "moving picture machine operator"; that he was the "moving picture machine operator" at the drive-in theater referred to by the witnesses for appellant; that the surface of the parking area of the drive-in theater was flat; that he never saw any inclined parking ramps, mounds, or terraces in the parking area; that he was familiar with the sand on the beach at Galveston, Texas; and that it would not have been possible to have constructed such parking ramps out of the sand without the support of walls or abutments, because, he said: "The sand shifts when dry and when wet. The wind shifts it when it is dry and water shifts it when it is wet." The witness further stated that he did not know why the theater was called a drive-in theater; that he did not recall seeing the sand graded; and that the parking area was not lighted.

The witness Moorman H. Snow, a motion picture operator, testifying for appellee, stated that the drive-in theater at Galveston was open for business in July, 1934; that it was an open-air theater; that the term "drive-in," as applied to appellant's theater, meant that one could drive his automobile into the theater and watch the picture being shown; that appellant's theater had a parking place for automobiles; and that he had never entered the parking area.

Appellee's witness Bernard McComb stated that he was manager of a radio service in Galveston, Texas; that he installed the sound equipment in appellant's theater; that a Mr. A. H. Emenhiser operated the theater; that he worked in the theater as "maintenance man for the sound equipment only"; that he also ran "the sound truck advertising the theater"; that there was a parking space for automobiles which extended back to the projection

room; that automobiles were parked all the way around the parking space and as close to the screen as possible so that vision would be good; that some automobiles were "stuck in the sand around the theater"; that the surface of the sand in the parking area was flat; that he never saw any inclined parking ramps, although it would have been possible to have made parking ramps out of the beach sand; that automobiles could have been parked on such ramps; that the sand where the automobiles were parked was wet down; and that admission was collected from those who parked their automobiles, as well as from those who were seated on benches in the theater. The witness further stated that he had heard the manager (presumably Mr. A. H. Emenhiser) speak of putting in parking ramps, but that, as he recalled, they had been unable to do so for financial reasons, and that there were no driveways in the theater.

Appellee's witness C. O. Wallace stated that he was a carpenter, located at Galveston, Texas; that he worked as a carpenter during the construction of appellant's drive-in theater; that after the theater was constructed, he visited it about three times; that the theater was fenced in and automobiles could not be driven into the theater grounds; that he saw automobiles parked at the theater, but he could not say whether there was any provision for their parking, because he had never been out where they were parked; that automobiles were parked on the sand behind the seats; that there were no parking ramps; that parking ramps could not have been made out of the sand at the place where the theater was located; and that he had nothing to do with grading the sand. On cross-examination, the witness testified as follows:

"XQ.20. Well, you say you know Joe Townsend [referring to appellant's witness Joseph W. Townsend, Sr.]? A. Yes.

"XQ.21. Well, if Joe Townsend said they did grade this up so as to raise the front of the cars would you say he was right or wrong? A. Well, I would not say but I would not dispute his word. They may have done so. As far as I know, no. But it may be they did do it."

Appellee's witness Edward C. Valot testified that he was a motion picture operator; that he was employed as such by Mr. Emenhiser to work as a motion picture operator in a drive-in theater on a beach at Galveston, Texas, in 1934; that the theater was in operation for about 10 days; that it consisted of a screen, an open space of flat beach for parking automobiles, and about six rows of benches in front of the parking space; that, to his knowledge, there were no parking ramps in the parking space; that if there had been any parking ramps he would have seen them; that it was possible to construct parking ramps out of the sand, but that they would not remain long because they would either "blow away" or "wash away"; that he did "not think" that parking ramps made out of sand would support an automobile; that there were little mounds of sand ranging from one inch to two feet in height on the beach; and that "As long as it [the sand] is wet it is solid." When asked whether an automobile could be driven over the sand and parked on it, he said: "Yes, the natural formation of the sand from the action of the tides." The witness further stated that he saw automobiles parked in the space arranged for them, and that the parking area was lighted with green and red lights.

Other evidence was introduced by appellee for the purpose of showing that a drive-in theater could be constructed so that persons sitting in automobiles could see the picture being shown without having the front wheels of the automobiles elevated by parking ramps.

It clearly appears from the evidence introduced by appellee that appellee conceived the invention defined by the count in issue on or about March 14, 1937, and that he reduced it to practice by the construction and operation of a theater in Detroit, Michigan, sometime in May, 1938.

In rebuttal, counsel for appellant identified and offered in evidence appellant's Exhibits 12, 13, and 14, hereinbefore referred to.

The Board of Interference Examiners held, and properly so, that those exhibits were not proper rebuttal evidence and refused to consider them.

Appellant's witness Ted Townsend testified that he was a longshoreman; that he was the son of the witness Joseph W. Townsend, Sr., who had charge of the construction of appellant's theater at Galveston; that he helped his father build that theater; that the parking area for automobiles was graded so that the front wheels of the automobiles would be elevated;

that automobiles could be driven forwardly over the knolls or mounds, as the witness called them, from one parking space to another and from one driveway to another; that the mounds were about 1½ feet in height; that the knolls or parking ramps were about 3 or 4 feet wide at the top; that he visited the theater one night and parked his automobile in a parking space and had no difficulty seeing the show while seated in the automobile; that when he left the theater he backed his automobile as there was another one parked in front of him; and that although his work as longshoreman called him away from his work on the theater before it was finished, he was at the theater every evening during its construction and watched a negro grading the parking ramps.

Joseph W. Townsend, Sr., was recalled by appellant. He stated that the witnesses who testified for appellee that the parking space for automobiles in the Galveston theater had a flat surface were mistaken; that the parking space was lighted until the show started, at which time the lights were turned out; that when the show was over the lights were turned on so that drivers of automobiles could leave the theater; that after the theater was constructed he visited it about five or six times while it was in operation. When asked on cross-examination how he accounted for the fact that appellee's witnesses Warren, Valot, and McComb testified that they did not see any of the parking ramps, the witness testified as follows:

"A. Their memory is either bad or they just wanted to forget. I just cannot account for that.

"XQ.50. Don't you think their memories are as good as yours? A. They probably would be under some circumstances, better maybe.

"XQ.51. Didn't they have as good opportunity to see these knolls [parking ramps] as you did? A. Why no, because I was there and helped to fix them up."

Appellant's witness Sam McClese testified that he was superintendent of the Gulf Oil Company at Galveston, Texas; that he had had considerable experience in building roads with beach sand; that the sand at Galveston beach will pack when wet, but that when it dries out the wind causes it to drift.

Appellant's witness John Harris stated that he worked at the Gray Iron Works at Galveston, Texas; that he did some work on the beach drive-in theater in Galveston in 1934; that his work was that of a janitor, picking up papers and wetting down the sand so that automobiles might be parked properly, etc.; that the parking space for automobiles was constructed so that the front wheels of an automobile would be higher than the rear wheels; that he wet the sand so that it would not shift; that the knolls on which the front wheels of the automobiles were parked were about 12 or 13 inches in height; that he had seen the witness Mrs. Curtis Howard (whose maiden name was Louise Wallace) drive an automobile around the theater and park it on the knolls; that he had seen automobiles parked in the parking space during the operation of the theater; and that when the show was over they were driven forward over the knolls and out of the theater. On cross-examination he stated that there were lights around the theater for illuminating the parking space; that when the show started the lights were turned off; that the carpenters built wooden supports in front of the knolls; and that the supports were so built that automobiles were prevented from driving over the knolls. On re-direct examination he stated that there were no wooden supports for the knolls, but that instead the knolls sloped so that the automobiles could be driven over them.

Mrs. Curtis Howard, testifying for appellant, stated that she lived in Houston, Texas; that her maiden name was Louise Wallace; that at the time of the construction of the beach theater at Galveston, she was in the employ of Mr. A. H. Emenhiser, and that she knew appellant; that she was present during the construction of the theater on the beach at Galveston; that the theater was so arranged that it had a plurality of driveways and a plurality of parking knolls for automobiles; that the parking knolls and driveways were so arranged that there were two rows of knolls between two driveways; that the parking knolls or ramps were about one foot in height; that she drove Mr. Emenhiser's automobile, which, she stated, was an Auburn, onto the ramps or knolls for the purpose of ascertaining whether the occupants of an automobile could see the screen from both the front and rear seats;

that such tests were made all over the theater as rapidly as the knolls were constructed; that, in addition to testing the ramps as hereinbefore stated, she drove over them and had no difficulty in doing so; that the sand, of which the parking ramps or knolls were composed, was loose when dry, but packed solidly when wet; that the knolls had to be worked over every few days to keep them in proper condition; that there was a knoll or ramp for each row of cars, and about eight double rows of ramps; that there was a lighting arrangement provided for the parking area; that the charge for admission was collected from the people in automobiles by ushers; and that the only congestion of automobiles she had ever noticed about the theater was outside the theater where people parked their cars and attempted to see the performance without charge.

Appellant also testified in rebuttal, and stated that in his Galveston drive-in theater an automobile parked on one parking ramp could be driven forwardly over and onto the driveway in front or to another parking ramp as desired.

In its decision, the Board of Interference Examiners stated that appellant had renewed at final hearing his motion to amend the interference by adding proposed counts 2 to 6, inclusive, which motion had been denied by the Primary Examiner. The board further stated that it knew of no authority which authorized it to "reinvestigate the denial of a motion to amend at final hearing and, accordingly, no action is taken on Josserand's (appellant's) renewed motion to amend."

It is argued here by counsel for appellant that the board erred in not considering appellant's motion to amend, although counsel concede that they know of no authority which supports their contention.

■ A motion to amend an interference, under rule 109, supra, is an interlocutory motion, and merely presents the question as to whether or not the interference shall be redeclared. It does not, when denied, relate to the issue of priority of invention of the count or counts involved in the interference, and neither the Board of Interference Examiners, nor, on appeal, this court, has authority to review and determine that issue. See American Cable Co. v. John A. Roebling's Sons Co., 62 App.D.C. 168, 65 F.2d 801. See also Lowry v. Allen,

203 U.S. 476, 27 S.Ct. 141, 51 L.Ed. 281, and Headley & Thompson v. Bridges, 48 F. 2d 938, 18 C.C.P.A., Patents, 1331.

The board also stated that appellant had renewed his motion to shift the burden of proof, and held, among other things, that neither appellant's patent No. 2,102,718, nor his reissue application, disclosed the invention defined by the count in issue; that the motion to shift the burden of proof was properly denied; and that appellant was not entitled to rely on the filing date of his application which matured into his patent either for conception or constructive reduction to practice.

■ We have given careful consideration to that issue, and are in agreement with the board that appellant's patent does not disclose the involved invention and that, therefore, the motion to shift the burden of proof was properly denied.

With reference to the evidence presented by the parties relative to the construction of the drive-in theater at Galveston, the board stated that it was contradictory; that it was possible that the testimony of the witnesses for both parties was in part correct; and that it was "quite possible that the theater had ramps on some days and was practically flat on others." The board concluded that if the drive-in theater at Galveston was constructed as claimed by appellant's witnesses and did incorporate the involved invention, its construction, so far as the feature, "drive-over ramps," called for by the involved count is concerned, constituted a "mere accidental practice" and was not a "conscious incorporation of the invention in issue such as would constitute a reduction to practice." In support of such conclusion, the board cited the cases of Thompson v. Smith, 33 App. D.C. 284, and Janette v. Folds et al., 38 F.2d 361, 17 C.C.P.A., Patents, 879.

The board further stated that in view of "the contradictory testimony relative to the construction of the Galveston theater as well as the possibility of variation in this structure by forces of nature such as we have described above [the shifting of the sand by the wind], we are unable to find sufficient evidence that the invention in issue was so incorporated therein as to constitute either a conception or a reduction to practice," and that as appellant had introduced no evidence of any other activity on his part until the filing of his involved application, it was unnecessary that

it consider the evidence introduced by appellee. The board, accordingly, awarded priority of invention of the subject matter defined by the count in issue to appellee.

Because of the views expressed by the board, we have extensively reviewed the testimony relative to the construction and operation of the Galveston drive-in theater. We realize that there are some contradictions in the testimony of appellant's witnesses, particularly as it relates to matters not of vital concern in this interference; to wit, the size of the screen, the distance it was removed from the surface of the ground, etc. However, the testimony of appellant's witnesses T. W. Emenhiser, Richard Townsend, Joseph W. Townsend, Sr., and Ted Townsend, who constructed the parking area for automobiles, and Mrs. Curtis Howard, who was greatly interested in such construction and who tested the parking ramps as hereinbefore stated, is sufficient to establish that the parking area not only included parking ramps, but also drive-over ramps and driveways as called for by the count in issue.

Appellee's witnesses, who testified that there were no parking ramps, drive-over ramps, or driveways in the Galveston drive-in theater, admittedly had nothing whatsoever to do with the construction of the parking area, nor were they particularly interested in its construction. Accordingly, in our opinion, they would be less likely than appellant's witnesses either to observe or to recall the details of such parking area.

■ We are of opinion that the testimony of appellant's witnesses is entitled to greater weight than that given by the witnesses for appellee, and that appellant has established by a preponderance of the evidence conception and construction of a drive-in theater conforming to the count in issue as early as July 5, 1934, and a successful reduction of it to practice from July 5 to July 25 of that year. In so holding, we are not unmindful of the fact that appellant alleged in his preliminary statement that he started a drive-in theater which was experimented with at Galveston, Texas.

We are not in agreement with the views expressed by the board that the construction and use of the drive-over ramps in appellant's Galveston drive-in theater constituted mere accidental practice, within the purview of the decisions relied upon by the board. It is obvious from the testimony of appellant's witnesses that drive-over ramps were absolutely essential to the successful operation of appellant's drive-in theater, and that appellant and his corroborating witnesses were aware of that fact. It is true that appellant and his witnesses were not familiar with the term "drive-over ramps" at the time of the construction of appellant's drive-in theater. It may be observed, however, that, although the term "drive-over ramps" appears in the count in issue, which originated in appellee's application, it does not, so far as the record before us discloses, appear elsewhere in that application.

It is contended here by counsel for appellee that the testimony relating to the construction of appellant's drive-in theater at Galveston ought not to be considered by the court, because of the fact that appellant did not allege in his preliminary statement a particular date when the involved invention was constructed and successfully reduced to practice.

As hereinbefore noted, appellant alleged that the invention was reduced to practice by the filing of his application December 14, 1933, which matured into patent No. 2,102,718 on December 21, 1937, and that "since that time [December 1933] actual theaters constructed in accordance with the invention have been made and used."

■ In the case of Johnson v. Weissman (Weissman v. Ferguson), 1937 C.D. 3, it was held on the authority of Connor v. Williams, 1878 C.D. 137, and Richards v. Meissner, 24 App.D.C. 305, 1905 C.D. 595, that where it is stated in a preliminary statement that a party completed the invention in issue within a certain period, as within a certain month, proof may be submitted to fix the date at any time within the period.

■ In the instant case, the issue raised in this court by counsel for appellee was not raised before the tribunals of the Patent Office and, therefore, will not be considered by us. However, the case of Johnson v. Weissman and (Weissman v. Ferguson), supra, has been cited for the purpose of showing the practice in the Patent Office.

■ Subsequent to the filing of the record in this court, appellee filed a motion

suggesting a diminution of the record by adding thereto the following documents:

1. Decision of Acting Examiner of Interferences, dated August 17, 1940.

2. Decision of Acting Examiner of Interferences, dated August 28, 1940.

3. Decision of Examiner, Div. 33, dated October 1, 1940.

4. Decision of Primary Examiner, dated on or about December 6, 1940.

5. Decision of Primary Examiner, dated March 11, 1941.

The motion was granted, subject, however, to the order of the court that the costs of printing the additional matter requested by appellee should be taxed on final decision.

We are of opinion that the additional matter so certified to the court was necessary to a proper determination of the issues in the case. Accordingly, the costs of printing the same will be taxed against appellant.

We are of opinion that appellant was the first to conceive and the first to reduce to practice the invention defined by the count in issue, and that he is entitled to an award of priority of invention.

The decision of the Board of Interference Examiners is reversed.

Reversed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.