37 C.C.P.A. (Patents)

## SMITH v. HAYWARD.

Patent Appeals No. 5619.

United States Court of Customs and Patent Appeals.

June 28, 1949.

Rehearing Denied Oct. 4, 1949.

Lester B. Clark and Ray L. Smith, Houston, Tex., for appellant.

James P. Burns, Washington, D. C. (R. Werlin, Houston, Tex., of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges.

O'CONNELL, Judge.

The senior party, Smith, appeals here from the decision of the Board of Interference Examiners of the United States Patent Office, designated in the certified transcript of the record as the Board of Patent Interferences, awarding priority of invention of the subject matter defined by the four counts in issue, Nos. 1, 2, 3, and 4, to appellee, the junior party, John T. Hayward.

The interference involves appellant's application, No. 230,274, filed September 16, 1938, and appellee's application, No. 265,470, filed April 1, 1939. Both parties took testimony, filed briefs, and were represented at final hearing.

The subject matter of the counts relates to a method of detecting the presence of gas in the mud-laden fluid employed in the drilling of an oil or gas well by the rotary method. In view of the state of the record, the numerous reasons of appeal and the arguments of counsel, it is deemed necessary to reproduce all four counts which compose the issue:

"1. The method of detecting gas which has become dilutedly occluded in the circulating mud-laden fluid employed in the drilling of an oil or gas well by the drilling of a stratum while the fluid column is maintained at a head exceeding the head of the stratum, comprising, causing separation of and collecting gas from the drilling fluid at the top of the well, as the drilling proceeds, in amounts sufficient for analysis and in accordance with increase of gas occluded in successive portions of the fluid and making comparative analyses of the collected gas in order to determine such increase.

"2. The method of detecting gas which has become dilutedly occluded in the circulating mud-laden fluid employed in the drilling of an oil or gas well by the drilling of a stratum while the fluid column is maintained at a head exceeding the head of the stratum, comprising, applying a gas-releasing force to the drilling fluid at the top of the well, as the drilling proceeds, in order to cause gas to evolve therefrom in accordance with increase of gas occluded in successive portions of the fluid, collecting the gas as evolved from successive portions of the fluid and mixing air therewith, and determining the increase of the gas evolved from successive portions.

"3. In the art of drilling wells by the rotary method, where a stream of drilling mud is circulated into and out of the well bore, the method of continuously determining the presence or absence of gas in the returning mud as an indication of the penetration of a gas bearing formation which includes the steps of, allowing the separa-

tion of gas from the stream of returning mud, and indicating to the operator that gas is separating.

"4. The method of detecting gas which has become dilutedly occluded in the circulating mud-laden fluid employed in the drilling of an oil or gas well by the drilling of a stratum while the fluid column is maintained at a head exceeding the head of the stratum, comprising, causing separation of an collecting gas from the drilling fluid at the top of the well under atmospheric temperatures, as the drilling proceeds, in amounts sufficient for analysis, and making analyses for the collected gas."

Counts 1, 2, and 4 originated in appellee's application, and count 3 in that of appellant. Both applications are substantially identical and, with reference to the drawings of the respective parties, appellant states—" * * * that each shows the well bore with the drill pipe therein and the return pipe for the drilling mud to which pipe a trap for gas is connected, that each Smith and Hayward contemplated a pressure reducing means such as a suction pump so as to assist in the separation of the gas from the mud by causing a reduction in the atmospheric pressure. Each Smith and Hayward provided a vent * * * for the admission of air so as to make a combustible mixture. Such mixture was then conducted to a balanced Wheatstone bridge where one of the four filaments, or legs, of the bridge is exposed to the combustible mixture of air and gas so that when electrical current is applied to the filament the heated filament would affect combustion. The change in resistance of such exposed filament due to combustion would then unbalance the circuit and give an indication on the gas indicating instrument or give an indication on a recorder if such were attached thereto. Neither party presented the details of the electrical Wheatstone bridge in their application for patent drawings because such circuits and instruments were well known to the public for other purposes."

■■ Appellee, the last to file, had the burden of proving priority of invention by a preponderance of the evidence. The board correctly held that the method of the counts is of the type where, given the conception, actual reduction to practice must be established by tests thereof performed under working conditions that satisfy the limitations of the counts, and that the testimony of the applicant relative to such reduction to practice must be properly corroborated, citing Corona Cord Co. v. Dovan Corp., 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610; McKee v. Stevens, 79 F.2d 914, 23 C.C.P.A.Patents 701; Croskey v. Atterbury, 9 App.D.C. 207; Bogoslowsky v. Huse, 142 F.2d 75, 31 C.C.P.A.Patents 1034, Petrie v. De Schweinitz, 19 App.D.C. 386.

Appellee Hayward testified that he was 56, a resident of Tulsa, Oklahoma, an engineer, and vice-president of the Barnsdall Research Corporation of Tulsa; that he first gave detailed consideration to the procedure defined by the counts in issue in May 1938; that he then discussed with a Mr. Richards, representative of the Mine Safety Appliances Company at its exhibit at the Petroleum Exhibition in Tulsa, the use of a certain make of hot wire detector; that on June 2, 1938, he made a sketch in a book he kept for making sketches of his ideas and also wrote on the sketch a short description of the use of a hook-up of a hot wire detector applied to the conventional type of logging at a rotary well; that he had the said sketch and short description, appellee's Exhibit 5, witnessed by H. W. Manley on June 3, 1938; that Richards called at appellee's office where the matter was again discussed and appellee made a rough sketch of his idea for Richards so as to learn from him whether some model of a hot wire detector made by the Mine Safety Appliances Corporation could be used for the same purpose; and that appellee very shortly thereafter obtained through Richards a portable instrument manufactured by the Mine Safety Appliances Corporation for giving warning and indicating the presence of explosible gases in air. The stipulated evidence of record of Richards and Manley corroborate the matters hereinbefore described.

In view of the statement in appellant's brief before the board, according appellee the date of June 22, 1938, for conception, and the weight accorded to the stipulated

testimony of Richards and Manley, the board held that appellee had established conception of the invention defined in each of the counts at least as early as June 22, 1938.

Appellee further testified that he took the instrument which he had obtained through Richards, the hot wire detector, to Barrow Well No. 1 located near Thibodaux, Louisiana, and at that well used the detector in hook-up for logging gas from June 22 to July 22, 1938, during the drilling operation by the rotary method which was then and there conducted; and that the regular rotary mud was used in carrying out the method defined by the limitations of the respective counts by the hot wire detector at the Barrow Well No. 1 between June 22 and July 22, 1938. With respect to appellee's tests of his hot wire detector, and his bottle method, the following excerpts are taken from the record relative to appellee's own testimony:

"Q. 122. What conclusions, if any, did you reach as a result of the operation of the hot wire gas indicator on the Barrow No. 1 Well in the manner about which you have testified? A. The operation was entirely successful; so much so that immediately upon return to Tulsa I wrote a letter suggesting patenting to Mr. Werlin, Hayward Exhibit No. 4.

"Q. 123. Which you have stated was accompanied by the two pages of descriptive matter? A. That is so.

"Q. 124. Was this hot wire gas indicator used for indicating gas and gas logging on any subsequent wells to the Barrow No. 1 Well? A. It was. It was used on a number of wells. The next well after the Barrow Well was the Keeran No. 1.

"Q. 125. I hand you two sheets bearing the heading 'Well Report', and ask you if you can identify them and tell us to what they relate? A. This is the official record of the drilling and completion of Keeran No. 1 Well in Victoria County Texas. It is a copy of the record as filed with the Texas Railroad Commission.

\* \* \* \* \* \*

"Q. 136. Do you know whether the bottle method of logging was continued on the Keeran No. 1 Well? A. Yes, the bottle method of logging was continued, both on the Keeran Well and for a few wells afterward.

"Q. 137. If the hot wire detecting method of logging was satisfactory, why did you continue to use the bottle method? A. We had already been using the bottle method. We had the equipment and we continued it as a double check."

Appellee further testified that the operation of the hot wire gas device on the Keeran well during July and August 1938, was entirely successful, and the record discloses that the invention was used continuously and with success on subsequent wells through to the filing date of appellee's application on April 1, 1939.

The testimony given by appellee relative to the successful tests of the hot wire detector method performed by him or under his direction at the respective wells on the dates specified was satisfactorily corroborated by the testimony of the witnesses Bernard L. Boccella, District Superintendent of the Baroid Well Logging organization, formerly employed in the logging operation by the Barnsdall Oil Company on the location of the Barrow Well No. 1, the Keeran Well No. 1, and other wells; and Charles B. Johnson, chief petroleum engineer for the Chicago Corporation and formerly employed with the Barnsdall Oil Company. Those two witnesses testified orally regarding their activities with the hot wire detector at the wells in question during the summer of 1938, and in so doing referred to various authentic records, including such exhibits as time sheets, flow sheets, logs, record strips, and photographs, all of which have been identified by the board in its decision.

Having reviewed appellee's evidence in detail and referred to the fact that appellant testified he remembered telling appellee's witness Johnson that appellee's hot wire detector method would work, the board rejected appellee's contention that the invention defined by the limitations of the counts was reduced by him to actual practice by the repeated taking of samples, whereby successive samples of the mud

separated at the surface of the well by a continuously operating sampler wheel from the stream and carrying such gas as may have been occluded therein were subjected to measurement in a bottle. In making that rejection the board pointed out the various limitations of the respective counts in which appellee's sampler method was obviously deficient.

Another similar method of the sampler wheel type upon which appellant relied for actual reduction to practice was likewise rejected by the board. The board further held, however, that the evidence submitted on behalf of appellee properly established actual reduction to practice of appellee's hot wire detector method by his use of the hot wire device at the Barrow No. 1 well and the Keeran No. 1 well at least as early as the latter part of August 1938.

Appellant presents his evidence in chronological order and contends it establishes beyond any reasonable doubt that he was first to conceive, first to build and successfully practice the invention; first to borrow an instrument to practice the invention; and first to file his application for a patent. He contends further that he was reasonably diligent during the critical period, but having been the first to reduce to actual practice, no burden of diligence thereafter rested upon him as an applicant for a patent.

The record discloses that when appellant gave his testimony in Houston, Texas, on September 30, 1946, he was 40 years of age, a resident of Texas, and skilled in the art involved.

Appellant testified that in January 1935, he conceived the idea of detecting the existence of gas in the drilling mud returning from a well being drilled by the rotary method, and originally devised and manufactured an instrument to accomplish that result. Such instrument did not, however, embody the invention of the counts, appellant stated, because it did not separate the gas from the drilling mud or allow the separation thereof, but it did lead appellant to invent the device here in issue and also the method defined by the counts.

Appellant further testified that in February or March 1937, he disclosed his invention to his friend and business associate in the United Gas Company, Starr Thayer, 59, a graduate and consulting electrical engineer. An affidavit for corroborative effect is in the record, Smith's Exhibit 19, made and signed by Thayer and dated July 17, 1941, on the occasion when Thayer was trying to get into the Army and appellant wanted the affidavit in case Thayer left for his military assignment.

The second development in appellant's invention, according to his testimony, occurred when he purchased from the Davis Emergency Equipment Company one J. W. filament, one aspirator bulb, and one jack block to fit the type of filament, and took those three basic items to the machine shop of W. E. Pielop in the city of Houston, where, under appellant's supervision during June and July 1937, appellant, the machinist Pielop, who was then Thayer's next door neighbor, but who had died prior to the time of taking testimony, W. E. Pielop, Jr., and Thayer made appellant's instrument here in issue, Smith's Exhibit 9, which they encased in a black box identified by them as a Hot Wire Combustible Gas Detector.

An affidavit of record procured by appellant from W. E. Pielop, Sr., on July 12, 1941, prior to his death, states that appellant's instrument was made by W. E. Pielop, Sr., in his shop during June and July 1937, and that the instrument was made into a successful mud gas detecting instrument for continuously detecting gas in drilling mud circulated out of a drilling well.

Appellant testified he conducted tests of the black box instrument in the Pielop shop and thereby detected gas during the latter part of July 1937, as was also testified to by W. E. Pielop, Jr., and Thayer; that appellant had also tested the box as a gas detector and separated gas from jars of drilling mud in his garage the first part of August 1937, as testified to by Thayer, appellant's wife, Alma E. Smith, and his mother-in-law, Mrs. H. H. Watson, in corroboration.

Appellant further testified that in July 1937, he borrowed from a supply company, through the witness Russell Berkley, a J. W. gas detector instrument of the type appellant had seen a number of years earlier in use for detecting gas at other locations, such as along buried pipe lines; that appellant took the borrowed instrument and his own black box instrument, together with a number of fruit jars, and went to Pierce Junction, where he used both instruments in making numerous tests on the mud returned at the end of the flow line of a well which was there being drilled; that both instruments were used one after another in taking samples at the point of the flow line mentioned, and from time to time, as progress was made in drilling the depth of the hole; that appellant took home approximately a dozen jars filled with samples of the returned mud thus obtained and thereafter successfully tested them in the presence of his wife and his mother-in-law, whose recorded testimony is relied upon by appellant as corroborative.

With reference to appellant's activities and accomplishments during the year 1938 relative to tests made by him, appellant stated that he wanted to log a well more thoroughly by further tests and experiments; that in the spring of 1938 he talked to A. C. Murrel, a drilling superintendent in the Eureka field near Houston, who gave appellant permission to use his gas detector on the Laura Lackner Well No. 2; that appellant there used the gas detector black box, Smith's Exhibit 9, on said well to separate and detect gas from the drilling mud at the top of the well during the drilling thereof in April 1938. Murrel's recorded testimony and that of the driller Roy A. Morrissey is relied upon by appellant as corroborative of his testimony.

Appellant also testified he took a number of samples of the returned mud from the same well and put them in glass jars, labeled them, took them to his home and there repeated his tests which, he testified, were witnessed by his wife and mother-in-law, whose recorded testimony appellant relies upon as corroborative of his stated facts.

Appellant further testified he repeated the same procedure with very successful results in May 1938, at Laura Lackner Well No. 3, and at his home, and relies upon the testimony of Murrel, and his wife as corroborative thereof; that on June 20, 1938, he used the same black box for separating and detecting gas on the Laura Lackner Well No. 1-A; that he also took home sample jars of the mud obtained by him from the said well while the gas and sand were being cored during the drilling operation, and thereafter successfully separated and detected gas from such samples at his own house, and also Thayer's, on June 20 and 21, 1938; and that in July 1938, he discussed his gas detector with his friend, J. E. Snoddy, with a view of promoting its use by certain corporations.

Appellant relies upon the recorded testimony of Murrel and Thayer as corroborative of appellant's testimony relative to his tests and taking samples at Lackner Well No. 1-A during June 1938, and upon that of Thayer and Mrs. Smith relative to the described house tests of June 20 and 21, 1938, and that of the witness Snoddy relative to appellant's disclosure to Snoddy in July 1938.

The board reached the following conclusion with respect to appellant's use of his black box gas detector on the jars of the returned drilling mud which he tested at places other than at the top of the well, as the drilling thereof continuously proceeded, numerical references to the record being here omitted: "The testing of the box per se is not the same as the testing of the process defined in the counts. Such devices were available to test for gas, and Smith actually borrowed one in 1937 to be used for detecting gas in drilling mud, according to another witness * * *. Counts 1 and 4 recite the step 'causing separation of and collecting gas from the drilling fluid *at the top of the well, as the drilling proceeds*' (emphasis added). The drawing off of gas by operating the bulb at a shop or home away from the well clearly is not a carrying out of this step, nor does it constitute 'applying a gas-releasing force to

the drilling fluid *at the top of the well, as the drilling proceeds,'* as recited in count 2 (emphasis added). Count 3 is a method of 'continuously determining' the presence or absence of gas in the returning mud, and as we have pointed out with respect to Hayward's early samples process, we do not believe that this limitation is satisfied by the repeated taking of samples with intervals between the samplings. Moreover, the count requires the separation of gas from the stream of returning mud. The mud in a jar obviously is not 'the stream of returning mud.' Accordingly, we hold that the use of a gas detector with jars of drilling mud away from the well does not satisfy any of the counts and can not establish reduction to practice of the invention defined in the issue, Jungersen v. Cohen et al., 544 O.G. 683, 1942 C.D. 632; 2 Cir., 129 F.2d 714, 22 C.C.P.A. 1188. (Italics quoted.)

The board further stated that while the testimony offered on behalf of appellant indicated that appellant had a device at an oil well, such testimony failed to properly establish he had there operated a combustible type of gas detector at an oil well in accordance with the limitations of the counts. Excerpts taken from the testimony of the witnesses Murrel and Morrissey are to the final effect that appellant had his black detector, Exhibit 9, at the Lackner wells, and saw him use it there. Appellant while testifying illustrated his device, appellant's Exhibit 30, which disclosed the use of a bulb, with the end of a hose in the open end of the flow line. When Murrel was asked if he could describe appellant's use of that instrument, Murrel replied: "A. Well, he had a black box that he set up there on the ditch. This mud flows through a conductor pipe into the wooden ditch, and he had a board across the ditch, and set the box across the ditch, and he laid the hose in the flow of the mud, and he had some other little rubber gadget that he squeezed on, I do not know what for or anything about it, but that was the performance he did."

The testimony of the witness Morrissey was along the same lines, and with respect to appellant's black box detector and its use by appellant, the record discloses the following questions directed to the witness and his answers thereto:

"Q. 13. Would you recognize that little box if you saw it? A. I sure would; you bet your life.

"Q. 14. I show you here a black box in the form of gas detector, in evidence as Smith Exhibit No. 9, and ask you if that is the box you saw Mr. Smith using? A. It looks very much like the box.

"Q. 15. What else did Mr. Smith do around there, if you remember? A. Well, to tell you the truth, I do not remember very much about it. Like I said, I didn't pay very much attention to it, but I know that he was there with a box like this."

Evaluating appellant's testimony and that of his corroborating witnesses relative to his tests at an oil well, together with his exhibits, the board held, certain numerical references to the record being here omitted as indicated by asterisks:

"It is apparent that these witnesses did not know exactly what Smith was doing and that they can not testify accurately as to any results he may have obtained. * * * Accordingly, Murrel and Morrissey fail to establish that Smith collected gas 'in accordance with increase of gas occluded in successive portions of the fluid' or that he made 'comparative analyses of the collected gas in order to determine such increase' (Count 1). The use of the bulb, with the end of the hose in the open end of the flow line (see Exhibit 30) does not 'apply a gas releasing force to the drilling fluid,' much less to cause gas to evolve in accordance with the increase of occluded gas in successive portions of the fluid; and Murrel and Morrissey do not establish that Smith determined the increase of gas from successive portions (Count 2). Similarly, operating the bulb in the open ended line is not 'causing separation' of the gas as recited in counts 1 and 4. In regard to count 3, the operation was intermittent * * * and was not continuous. Accordingly, it is held that the testimony of these witnesses does not convincingly es-

tablish that Smith reduced the invention to practice at the Laura Lackner wells.

"Smith testified that he used his device at a well in 1937 * * * but this is un-corroborated and we can not base a holding of reduction to practice on testimony of Smith alone. It is accordingly held that Smith must be restricted to September 16, 1938, his filing date, for reduction to practice in view of his failure to establish, by corroborated testimony, an actual reduction to practice of the invention in issue. Akers v. Papst, 521 O.G. 1105, 1940 C.D. 738; 113 F.2d 136, 27 C.C.P.A., Patents, 1400. Hayward accordingly is entitled to an earlier reduction to practice than Smith."

Appellant was accorded no particular date of conception. On that point the board held that though it were assumed appellant had a date of conception prior to that of appellee, nevertheless appellant was required to establish that he was continuously exercising reasonable diligence during the critical period, beginning just prior to appellee's entry into the field on June 22, 1938, and ending on September 16, 1938, when appellant filed his application; that appellant had not established such diligence during the required period, and therefore could not prevail in the interference proceeding.

On the issue of appellant's diligence the testimony of Lester B. Clark, an experienced registered patent attorney and registered professional engineer, who has represented appellant for a number of years is deemed significant. Among other things he testified:

"* * * I am having reference to my every day diary for the year 1938, and having reference thereto, I find that Mr. Smith, Mr. A. L. Smith, was in my office on July 29. At this moment I do not recall the nature of the conference.

"On August 3, Mr. Smith and Mr. Starr Thayer were in my office. As I have refreshed my recollection, I prepared an assignment of an interest in the Smith violet-ray oil detecting invention from Smith to Thayer, and proceeded to prepare an application for patent thereon.

"My record shows that on August 4 I was dictating an application for patent for Mr. A. L. Smith, which I would say was the violet-ray gas detector. Such application was filed in the United States Patent Office on August 8, 1938, and issued as Patent No. 2,206,922 in evidence here as Smith Exhibit No. 23.

"I have a notation in my diary on August 10, 1938, that Mr. A. L. Smith was in my office and that I instituted for him a search on a telephone wire attachment for pipe lines.

"My diary reflects a notation on August 24 that Messrs. Smith and Thayer were in my office, and my recollection is that Mr. Smith exhibited to me the disclosures of his now Exhibits 25 and 26, and that I advised him to write the date thereon, on each of these exhibits, and each of these exhibits bears the date of August 24, 1938. I do not recall at this time whether Mr. Smith authorized me on August 24 to proceed with the preparation of an application or not, but my diary reflects that on August 27 Mr. Smith was in my office and I accepted his commitment for the preparation and filing of application for patent on his gas detector invention, as reflected by Exhibits 25 and 26 now in evidence, and that I designated such application as my docket 1742.

Appellant's counsel Clark further testified, in part, relative to the filing of certain applications for appellant, including the one here in issue:

"It is my custom to keep a docket book in which the applications received by me are numbered chronologically, and I have before me this docket book for the period of 1938, which reflects that I designated Docket 1742 on a gas detector for drilling muds to Mr. A. L. Smith on August 27, 1938; and that the application was subsequently filed on September 16, 1938, and given Serial No. 230,274.

* * * * * *

"It is also my recollection that Mr. Smith did not have the funds to finance filing of his application for patent, Docket No. 1737, on communication along pipe lines, nor his Docket 1742, on the gas de-

tector for drilling mud, and that I extended credit to him, advancing the costs of filing, and that after he made an agreement with me whereby I would retain an undivided one-fourth interest in these two applications and inventions, and I still hold those interests."

■ The board in support of its position correctly pointed out that the drilling on the Laura Lackner Well No. 1-A was completed June 24, 1938, and that on August 24, 1938, appellant exhibited the drawings and disclosure of his Exhibits 25 and 26 to his counsel Clark; that during the intervening two months appellant had failed to establish he took any steps toward reducing the invention to practice; that whatever had been done by him towards promoting the commercial exploitation of the device during that period does not constitute a matter to be considered on the issue of appellant's diligence; that appellant's activity relative to other devices was of no assistance to him in reducing to practice the method of the instant counts; and that during the intervening period of the two months from July 24, 1938, to August 24, 1938, appellant had failed to establish that he had sought from his counsel Clark credit which would have enabled appellant to earlier file the application here in issue or that such credit would not have been forthcoming.

Appellant alleges in his reasons of appeal that the Board of Interference Examiners read unnecessary limitations into the counts and thereby erred in failing to give them either the broadest interpretation possible or the broadest interpretation which would be reasonable in the light of the inventive concept of the interference issue; and that—"The Primary Examiner erred and his decision was unchanged by the Board of Interference Examiners' decision in holding that proposed Counts, 4, 5, 6, 7, 9 and 10 as set forth in the decision on Smith's Motion to Amend, Interference Paper No. 26—were unnecessary in the determination of the interference issues."

Appellant contends with respect to the first of the two contentions hereinbefore described that the board should have held that the taking of the samples of the drilling mud in fruit jars and testing them, as practiced by appellant, constituted a reduction to practice of the invention defined by each of the respective counts in issue. Appellee urges that if appellant is correct in that contention, then the counts also embrace appellee's practice of his bottle method, which has an earlier date than any acceptable date for appellant's fruit jar tests.

The board in rejecting the contentions of each of the parties with respect to the point in issue significantly stated, among other things hereinbefore set forth, that— "Count 3 is a method of 'continuously determining' the presence or absence of gas in the returning mud, and as we have pointed out with respect to Hayward's early samples process, we do not believe that this limitation is satisfied by the repeated taking of samples with intervals between the samplings. * * *"

The board in rendering its decision discussed in lengthy detail not only the respective limitations of all the counts but also pointed out wherein the proofs submitted by the respective parties failed to satisfy those limitations. An examination of the board's holdings with respect thereto fails to disclose manifest error in such holdings.

Appellant in his argument has limited his discussion of the counts enumerated in the reason of appeal hereinbefore set forth to count 7. Appellant's proposed count 7 is an allowed claim taken from appellee's application and appellant states with reference thereto that while the count still calls for the causing of the separation and the collecting of the gas from the drilling fluid, it obviously reads upon and validates the tests as practiced by appellant's fruit jar method.

■ When the proposed count is considered in the light of the examiner's and the board's decisions, it is clear that the motion was properly denied and that the inclusion of the count in the interference would effect no difference in the final re-

sult. Moreover, a motion to amend an interference to add counts is an interlocutory motion which does not relate to the issue of priority and when denied by the examiner, the Board of Interference Examiners and, on appeal, this court has no authority to review and determine that issue. Josserand v. Taylor, Jr., 138 F.2d 58, 31 C.C.P.A., Patents, 709.

The essential step of the counts in issue, as appellant states in his reply brief, is the separating of the gas from the drilling mud, and we find no manifest error in the holding of the board that such separation must be effected at the well as the drilling operation proceeds under actual working conditions. The issue presented is essentially one of fact and the statement of this court to the following effect in the decision in the case of Israel v. Cresswell, 166 F.2d 153, 156, 35 C.C.P.A., Patents, 890, 895, is here applicable:

"It is obvious from the board's decision that it carefully scrutinized and weighed the testimony and all other evidence bearing upon the matter of reduction to practice, and it should be understood that we consider the case under the age old rule applicable in proceedings of a judicial character such as this proceeding is, viz, that an appellate tribunal will not reverse the findings of fact made by the trial tribunal from which the appeal is taken unless such findings be clearly against the weight of the evidence."

The respective holdings of the board from which this appeal has been taken reveal no manifest error nor are the findings of the board clearly against the weight of the evidence. In view of that conclusion, we deem it unnecessary to discuss other points to which the respective counsel have addressed their arguments. The decision of the Board of Interference Examiners, for the reasons hereinbefore stated, is affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.