36 C.C.P.A. (Patents)

## KRASNOW et al. v. BENDER.

### Patent Appeal No. 5402.

Court of Customs and Patent Appeals.

June 14, 1948.

Rehearing Denied Sept. 30, 1948.

Shelley Krasnow, pro se.

Richard K. Stevens, of Washington, D. C. (Robert F. Davis, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Interference Examiners of the United States Patent Office awarding to appellee priority of invention of the subject matter embraced in two counts. The counts read as follows:

"1. An apparatus for measuring the associated radio-activity of substances lining a deep narrow borehole comprising an electrical system adapted to give a series of electrical impulses, means to alter the frequency of the impulses in proportion to the intensity of the radioactivity proximate to the said means, a relay member actuated by the said system and the said means jointly, the electrical system, means, and relay member being held by a single relatively short holder so as to minimize leakage and capacity disturbances in the portion of the circuit connecting the said means and the said relay member, the holder further having narrow lateral dimensions so as to permit its insertion in deep narrow boreholes.

"2. An apparatus for measuring radioactivity at inaccessible locations comprising a system employing feeble electric currents, means to alter the frequency of the said feeble currents in proportion to radioactive intensity, a relay means operated by the said feeble currents, a circuit employing relatively intense currents, a conducting member, and indicating means, the feeble currents cooperating with the relay means to cause pulses of relatively intense current, the conducting member serving to convey the pulses of intense current to the indicating means, the con-

ducting member serving further to allow placing the system employing feeble electric currents and the relay means both remote from the indicating means, the relay means and system employing feeble electric currents being placed contiguous to each other so as to minimize disturbing effects."

The interference involves an application of appellants, Serial No. 137,380, filed April 16, 1937, assigned to Geophysical Development Corporation, and an application of appellee, Serial No. 359,816, filed October 4, 1940, for reissue of his patent, No. 2,133,776, dated October 18, 1939, on an application filed February 18, 1936. Wells Lane Company is the assignee of appellees.

On July 13, 1939, an interference, No. 77,260, involving eight counts was declared between an application of Jacob Neufeld, Serial No. 161,350, filed August 27, 1937, and the involved application of appellants. Later that interference was redeclared to include the application of Lynn G. Howell, Serial No. 224,504, filed August 12, 1938. Pursuant to a decision of the Primary Examiner of August 16, 1940, based upon motions to dissolve, the interference was reformed by striking therefrom counts 4 and 5, which are the counts of the present interference, and, in accordance with the provisions of Rule 129, Rules of Practice, 35 U.S.C.A. Appendix, the involved reissue application of appellee was added and the interference again redeclared with the parties in the following order: Howell v. Neufeld v. Krasnow et al. v. Bender. That interference is still in the Patent Office for decision.

The instant interference, No. 78,980, was declared on January 16, 1941. It involved the parties Bender, Neufeld, and appellants in that order. The proceeding was terminated as to the party Neufeld, he having made no showing why judgment on the record should not be entered against him, as appears in a decision of the Board of Interference Examiners dated January 12, 1944.

During the motion period appellants moved to dissolve the interference as to Bender on the ground that his disclosure is inadequate to support the counts and that he does not disclose any method or apparatus which will operate. Appellants also filed a contingent motion to amend the interference by the addition of one proposed count.

The Primary Examiner denied both motions and stated that there was "No interlocutory appeal." With respect to the latter motion, he held the proposed count to be unpatentable over prior art which had been cited in the ex parte prosecution of appellants' application. Thereupon appellants appealed to the Board of Appeals stating that "The Examiner erred in denying the Krasnow et al. contingent motion to amend for a two party interference with Bender on proposed count K3." Appellants contended that they were entitled to appeal because the present interference was split off from interference No. 77,260 and that that interference had been declared under the old practice in which an appeal was permitted from the denial of a motion to amend and because they were parties to that interference they had the right of appeal in the present interference.

Appellants also filed in each of the beforementioned interferences a motion to take testimony and to suspend the proceeding. They further moved in each of the interferences to file interrogatories to be answered by an officer of appellee's assignee and by an officer of Wells Survey, Inc. The motions were denied. Appellants and their assignee thereupon brought a civil action, No. 12,170, in the District Court of the United States for the District of Columbia praying that the commissioner be ordered to amend his decision denying plaintiff's motion to dissolve the interference between the applications which are here involved. The ground for plaintiff's contention in that action was that there had been no inadvertence, mistake, or excuse for delay in filing the reissue application. The District Court granted defendants' motion to dismiss. Geophysical Development Corporation et al. v. Coe, Com'r, Pats., D.C. 80 F.Supp. 760.

The opinion of Mr. Justice Bailey in that case is short and pertinent

here, as it answers many of the allegations vigorously urged by appellants with respect to lack of good faith on the part of appellee. We are in complete accord with Justice Bailey's reasoning and quote the opinion as follows:

"Interferences are declared solely for the purpose of determining priority of invention. If the plaintiff can show priority of invention he will be entitled to a patent: if he be the first inventor and otherwise complies with the law.

"This right will not be defeated by any action of the Patent Office in allowing a reissue of the opponent's patent.

"The procedure in the Patent Office in passing upon the question of reissue is one within the discretion of the Commissioner, and it does not appear that the practice adopted in this interference of not permitting proof to be taken on the question of good faith of the applicant for reissue other than his affidavit is contrary to the usual practice.

"Even if the Court had power to interfere in the action of the Commissioner in this case (which is only an intermediate step in the proceedings) I cannot see that the plaintiff can be irreparably injured. As said before, if the plaintiff can show priority of invention he will be entitled to a patent."

Upon appeal, the judgment of the District Court was affirmed by the United States Court of Appeals for the District of Columbia, 78 U.S.App.D.C. 39, 136 F.2d 275, certiorari was denied by the Supreme Court, 320 U.S. 760, 64 S.Ct. 68, 88 L.Ed. 453.

It appears that in the brief filed on behalf of the Commissioner of Patents in the Supreme Court in the certiorari proceeding, there was a statement in a footnote that interferences 77,260 and 78,980 are governed by the statute as it appeared prior to the amendment of August 5, 1939. Because of that footnote, appellants contend here that the Patent Office is bound thereby, and it was cited here in support of appellants' contention that they have a right to appeal from the decision of the

examiner denying their motion to amend as aforesaid.

The Board of Appeals held that it had no jurisdiction to entertain the appeal and stated as follows:

"The instant interference, No. 78,980, was declared on January 16, 1941. In Order No. 3487, 507 O.G. 513–514, Rule 124 was changed to deny the right of appeal from all decisions rendered on motions brought under provisions of Rules 109 and 122, in all interferences declared on or after October 5, 1939."

Upon a request for reconsideration of its decision the Board of Appeals stated as follows:

"On reconsideration no reason is found for changing the conclusions stated. Under the provision of Rule 124 this interference is regarded as standing on its own merits and as having been declared January 16, 1941, per stamp of Examiner of Interferences found on the declaration sheet.

"Whatever may be considered to be the meaning of the statement made in the footnote to page 5 of the Brief for Respondent in the Certiorari case, referred to by counsel for Krasnow et al, it does not appear that the statement was particularly relevant to the question before the Supreme Court, or at all relevent to the interpretation to be given Rule 124, since the statement referred only to the statute. The statute there in question is not concerned with interlocutory appeals."

Appellants then petitioned the commissioner, in his supervisory capacity, to rule that the Board of Appeals had jurisdiction to entertain the appeal. The petition was denied. The Assistant Commissioner pointed out that new Rule 124 was in operation prior to the declaration of the involved interference and since the date when that rule became effective the Board of Appeals had consistently held it to be applicable to interferences according to the date and number thereof regardless of the past history of the counts. In that connection, the Assistant Commissioner stated:

"New Rule 124 has been in force for quite a long time, during all of which time the practice stated has been followed consistently, and no good reason appears why the practice should be changed at this late date for this particular case which, due to the length of time present Rule 124 has been in force is believed to be the last interference in which a similar situation can materialize."

█ Appellants still contend here that the present interference is governed by the old practice and not in accordance with present Rule 124. We do not agree with such contention. That interference, even though the counts thereof originally appeared in interference No. 77,260, is a separate, distinct proceeding. The counts herein were excised from interference No. 77,260 with the same force and effect as though they had never been there. The present interference, No. 78,980, was set up between the parties named therein and on its own facts after the said effective date of new Rule 124 and should certainly, as was held below, stand on its own merits. To agree with appellants' contention would, in our opinion, result in an unwarranted disturbance of orderly procedure.

█ As may be observed, appellants have sought to prevail by employing almost every available technical means at their disposal. That was undoubtedly their right. We do not deem it necessary to discuss their many contentions attacking the good faith and technical ability of appellee which are generously sprinkled throughout their brief. They also continued such an attack by filing a motion in this court on April 26, 1948, to correct diminution of the record by adding thereto two affidavits, one by appellant Krasnow, and the other by one Edward Lipson, dated December 29, 1947. The motion was urged as an alternative to one remanding the case to the Patent Office for such further consideration as the affidavits might require. Both affidavits impugn the good faith of appellee. This appeal was argued and submitted to this court on May 3, 1948. It may be noted that the date of the Lipson affidavit is almost five months prior to the date of argument so

that it may well be inferred that appellants, to say the least, took their time in that attack. It seems to us that appellants paid little attention to the opinion of Mr. Justice Bailey, quoted herein. The issue here is priority of invention so we deny the motion in all respects.

█ We are certain that the United States Patent Office, acting through its proper officials, never knowingly or carelessly permits a patent to issue until it is convinced that measured by all proper standards, an applicant is entitled to his patent. The Patent Office is not bound to issue a patent to an applicant who prevails in an interference proceeding nor to a successful applicant in a court proceeding. Jeffrey Manufacturing Co. v. Kingsland, Comr. Pats., D.C., 77 F.Supp. 617. There may be good legal reasons why a prevailing application in a proceeding such as this, in the light of knowledge acquired by the Patent Office when such application is returned for an ex parte proceeding, should not be allowed to ripen into a patent, and when any such reason exists under those circumstances, it will, in our opinion, be recognized by that office.

This appeal will be decided by us on the only issues that were before the Board of Interference Examiners: Namely, the sufficiency of the disclosure of appellee to support the counts and the operativeness of that disclosure. We do not deem it improper to state at this point that we have not been helped in any great degree by the briefs filed by the parties. We have here a record containing almost eight hundred pages, comprising in great part the sundry and various motions and decisions, not always appearing in logical or chronological sequence. The briefs of the parties are voluminous but do not contain enough record citatons. Therefore we have been compelled to perform a great deal of unnecessary labor.

█ While both parties took testimony, none of it was directed to priority of invention. Appellants being junior to appellee have the burden of proving priority of invention by a preponderance of the evidence.

The involved invention is succinctly described by the Primary Examiner as follows:

"The invention defined in the counts relates to a method of or apparatus for measuring the radioactivity of the geological formations traversed by a drill hole. Changes in radioactivity indicate changes in conditions or in geological formation and from the data obtained it is probable that useful information can be derived concerning the nature of the strata traversed by the drill hole. It is entirely possible, for example, that oil bearing strata may be located by this method, since such strata are likely to have radioactive characteristics differing from those of the adjoining strata. Each of the counts recites or implies means for measuring the radioactivity of formations traversed by a bore hole in situ, as distinguished from the taking of core samples to the surface and there measuring the radioactivity. Measurement of radioactive intensity in a drill hole at depths measured sometimes in thousands of feet presents a particular problem. The detecting apparatus must be sufficiently small to be lowered into the drill hole, the diameter of which is in the neighborhood of six or eight inches. Indications of radioactivity must be capable of transmission to the surface in some manner and there made observable. In the embodiment of the invention which is common to all of the parties, *the detector of the radiations is a Geiger-Muller counter or the equivalent,* by which the radiations are transformed into feeble electrical impulses, the number of impulses per second being proportional to the radioactive intensity. *An important feature is the provision of an amplifier which is lowered into the drill hole with the detector,* whereby the impulses are amplified before being transmitted to the surface. The recorder or other receiver of the impulses is located at the surface." (Italics quoted)

While the disclosure in appellee's application is not lengthy and the drawing practically all diagramatic, with no detailed showing of circuit arrangements or device structure, it discloses a container designed to be lowered into the borehole of an oil well by means of a cable. Within the container is an X-ray tube and associated apparatus to provide a source of primary radiation. There is also within the container a detector of radiations eminating from the pierced earth formations in the borehole. The detector consists of a Geiger Muller counter, an amplifier, and a battery supply source. A means to record or indicate impulses from the counter is located above the surface of the earth. It is said that the X-ray tube makes radioactive strata more radioactive and that such activity is detected by the counter and its associated apparatus.

Contrary to the insistant contention of appellants, we are of opinion that the disclosure of appellee supports the counts. With respect to count one, the application of appellee discloses a Geiger Muller counter, an amplifier, a battery, and cable terminals. Those elements are "adapted to give a series of electrical impulses" as required by the count. The limitation "means to alter the frequency of the impulses in proportion to the intensity of the radioactivity proximate to the said means" is met by the Geiger Muller counter. The "relay member actuated by the said system and the said means jointly," is appellee's amplifier. In the limitation "the electrical system, means, and relay member" the "system" is met by appellee's counter, amplifier, and battery, "means" by the counter, and the "relay member" by appellee's amplifier. Those elements are "held by a single relatively short holder" shown by appellee's container, "so as to minimize leakage and capacity disturbances in the portion of the circuit connecting the said means [appellee's Geiger Muller counter] and the said relay member, [appellee's amplifier] the holder [appellee's container] further having narrow lateral dimensions so as to permit its insertion in deep narrow boreholes."

As to count 2, the Geiger Muller counter and an input circuit "employing feeble electric currents" is disclosed by appellee; "means to alter the frequency of the said feeble currents in proportion to radioactive intensity," is shown in the Geiger Muller

counter; "a relay means operated by the said feeble currents" is shown by appellee's amplifier; "a circuit employing relatively intense currents" appears in appellee's output current; "a conducting member" is appellee's cable to which the container is attached; "indicating means" is shown in appellee's above the earth recorder hereinbefore mentioned; "the feeble currents" from the counter of appellee "cooperating with the relay means" is met by appellee's amplifier, "to cause pulses of relatively intense current"; "the conducting member" is appellee's cable, "and indicating means" is appellee's recorder or indicator; "the feeble currents cooperating with the relay means" is shown by appellee's amplifier "to cause pulses of relatively intense current"; "the conducting member" appears in appellee's cable "serving to convey the pulses of intense current to the indicating means," which is appellee's recorder; "the conducting member" is appellee's cable, "serving further to allow placing the system employing feeble electric currents" is appellee's Geiger Muller counter and the indicator; "the relay means" is appellee's amplifier, "both remote from the indicating means" is the distance between appellee's recorder or indicator and the counter and amplifier; "the relay means" is appellee's amplifier, "and system employing feeble electric currents" is appellee's Geiger Muller counter and amplifier "being placed contiguous to each other so as to minimize disturbing effects."

Appellants vigorously urge that the application of appellee makes no disclosure of a relay as such, and that in order to construct a relay member from his application disclosure, it is necessary to read the amplifier as being a part of the electrical system and also as a relay member. They further insist that there is no showing of an alteration of frequency of impulses proportionate to the intensity of the radiation and that appellee does not disclose that his container is a short holder which is said to minimize leakage and capacity disturbances. There is no requirement in the counts for a mechanical relay. It seems to us, as was held by the board, that appellants' amplifier may be considered a relay and certainly appellee discloses such amplifier. It further appears to us that the amplifier need not be included in the electrical system adapted to send impulses from the Geiger Muller counter with its battery supply. It seems clear to us that "The number of impulses from the counter increases with exposure to increased radioactivity." The only element of the system of appellee which is not placed in the housing or container is the recorder. All of the other elements are in the container which is adapted to be lowered into the oil well. In our opinion, the housing or container of appellee is shown to be "relatively short" and it necessarily follows that a container of such "relative shortness" inherently minimizes leakage and capacity disturbances.

Since the disclosure of appellee reads directly on the counts, it is clear that there was no error in the decision of the Board of Interference Examiners in so holding.

The contentions made by appellants with respect to the operativeness of appellee's disclosure is that the X-ray tube device is incapable of producing any secondary radiations in the strata of the borehole which are detectable. It will be observed that neither of the counts require that the bore strata be treated with primary radiations in order to produce secondary radiations and, therefore, it becomes unnecessary for us to decide whether or not such contention of appellants is well taken.

The application of appellee is not confined to the use of primary radiation. In his application it is stated: "In some instances only the detector may be used and the normal radio activity of the formation detected if desired."

Unquestionably, according to the record, the Geiger Muller counter is well known in the art as a detector of any radioactivity that may be in its vicinity. While it is true that Bender in his disclosure referred in certain places to the Geiger Muller counter as detecting incoming electrons from the strata of the borehole, the term

"secondary radiations" was substituted for the word "electrons" after his application had been filed.

It is clear from a reading of appellee's application that he did not intend to restrict his system to the detection of electrons but that he intended to include the detection of radioactivity. In his specification it is stated that his device may be used "to detect the location of radioactive formations"; "for locating radioactive materials by detecting the location of the radiant energy discharged by such materials"; "a radiant energy detecting device so that the radiant energy detected can be recorded."

 Whether or not appellee understood the scientific theory of his detector is immaterial if in his application he sets forth enough of the operation of the device so as to inform the public what to do with it.

 It is fundamental that even though a device may be disclosed as incomplete or inoperative, it may be corrected if such correction be made by one skilled in the art in such manner as not to involve invention. Creed et al. v. Potts, 96 F.2d 317, 25 C.C.P.A., Patents, 1084; and Wheeler, Hoover, and Kirkas v. Kleinschmidt and Colman, 149 F.2d 161, 32 C.C.P.A., Patents, 975.

It was contended by appellants that because there is no connection between the battery and the oscillograph or recorder of appellee, that his disclosure is inoperative. The drawing in appellee's application shows that the battery is grounded at one point and the receiver is grounded at another. It is not stated that the grounding of the battery is made to the casing or container or that the casing is so insulated as to prevent a circuit through the ground wire. In our opinion the board was correct in its statement that anyone skilled in the art would readily recognize the conventional showing of the grounds from the battery and the recorder as indicating the forming of the same electrical circuit.

Appellants repeatedly argue that appellee should not prevail in this proceeding for the alleged reason that he admitted his disclosure to be inoperative and further that his attorneys repeatedly asserted inoperativeness thereof. We do not think that in view of the record that such contention is sound. It appears that appellee, who was subpoenaed as a witness on behalf of appellants, could not be brought to admit under a vigorous examination that his entire disclosure was inoperative. He did admit he had been unable to get his device to work with an X-ray tube, radium, or uranium, and further that when he used an FP 54 tube in the amplifier an additional stage of amplification would have to be employed. He testified plainly and unequivocally that one skilled in the art could take his patent disclosure and cause it to operate so as to pick up natural radiations in well bore formations.

 It was stipulated by the parties that if a certain witness were called, he would testify that appellee stated to him that the disclosure of his patent was inoperative. Even if appellee had so stated, there is nothing in the stipulation to indicate that appellee admitted that it was totally inoperative nor does it appear in the stipulation that appellee stated whether or not he told that witness that such defects as might appear in his disclosure could not be cured by the exercise of ordinary skill in the art. With respect to those admissions, we agree with the board that they are not conclusive of inoperativeness with respect to the subject matter of this interference.

 The Bender disclosure was stated to be inoperative by one of his attorneys in another proceeding but such statement was not directed to the subject matter in issue here by merely to the use of the X-ray tube as a source of primary radiation.

Counsel for appellee did not appear as counsel of record during the prosecution of his original application. They did appear in several cases, which were not assigned to the Bender assignee, against which cases the Bender patent was cited as a reference. As is usually done in patent litigation, they attempted to avoid the Bender patent as a reference and in so doing, argued as to the inoperativeness

and insufficiency of appellee's disclosure. The best that can be said of such an argument is that it was merely the opinion of counsel as of the time it was made and, of course, such opinion would be subject to change. As any statement made in said argument could not be made on behalf of appellee or his assignee, it is not an admission against interest. Furthermore, there is nothing in the record to show that the Primary Examiner agreed with such arguments as were then made in those cases by the present counsel of appellee.

Inter partes tests were made by appellants for the purpose of demonstrating that the device of appellee's disclosure was inoperative. Some circuit arrangements were set up and tested and alleged to be strictly in conformity with the disclosure of appellee. Some of the tests had modified circuit arrangements said by appellants to be favorable to the operability of the disclosure of appellee. None of the circuits so set up were found to be operative. In all of the tests, however, a relatively low potential was applied to the Geiger Muller counter but in testing the counter itself to determine if it would operate, a much higher potential was used. It seems that in order to successfully operate a Geiger Muller tube it is necessary to employ ordinary voltage in excess of 500 volts. That was well known to the art prior to the filing of the original application by appellee. The board stated that on the basis of the voltage necessary to operate the counter tube, the tests conducted by appellee were not conclusive with respect to inoperativeness of the disclosure of appellee because skill in the art was not used in performing the tests even if it were conceded that appellee disclosed the use of a low potential on the counter tube. We are unable to see any error in such holding of the board.

In appellee's diagramatic disclosure he does not set out any particular voltage as applied to a counter tube. The drawing simply shows two wires leading from the counter tube to a position which is described in the specification as an amplifier which may take various forms. It seems

clear to us that anyone skilled in the art, in attempting to use a device such as appellee's disclosure, would employ the known and accepted voltage on the counter.

The board in its decision stated that it did not understand from appellee's showing of his indicator or recorder, as being connected to two terminals on the box called battery source, that the said instrument was to be connected directly across the battery terminals as was done in one of the tests made by appellants. In that connection, the board stated "certainly this is not such a connection as one ordinarily skilled in the art would make." We can not say that the board was wrong in such holding.

There is much testimony in the record on behalf of appellants concerning the use only of a FP 54 tube in the amplifier but the specification of appellee does not so limit the amplifier. It is stated in his application that "The amplifier 47 may take various forms but it has been found that when it is equipped with a General Electric Company tube type F. P. 54 that satisfactory results are obtained." In view of the entire record on behalf of appellants, we are of opinion, as was the Board of Interference Examiners, that appellants have not established that appellee's disclosure is so defective that it would fail to teach one skilled in the art how to make an operable device.

While appellee took testimony with respect to the operability of his device and made several inter partes tests, in view of our holding that appellants have not convinced us that appellee's device is so incomplete that a person skilled in the art could not make an operative system therefrom, it is unnecessary to discuss the record on behalf of appellee.

For the reasons hereinbefore set out, the decision of the Board of Interference Examiners is affirmed.

Affirmed.

By reason of illness, O'CONNELL, Associate Judge, was not present at the argument of this case and did not participate in the decision.