38 C.C.P.A.(Patents)

## Application of JOSSERAND.

### Patent Appeals No. 5779.

United States Court of Customs
and Patent Appeals.
April 10, 1951.

Lester B. Clark, Houston, Tex. (Charles W. Rivise, Philadelphia, Pa., Gustave Miller, Washington, D. C., Ray L. Smith, Houston, Tex., and Caesar & Rivise, Philadelphia, Pa., of counsel), for appellant.

E. L. Reynolds, Washington, D. C., for Commissioner of Patents.

Before GARRETT, Chief Judge and JACKSON, O'CONNELL, and JOHNSON, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner, hereinafter referred to as the examiner, of all the claims, numbered 22 to 27, inclusive, of appellant's application for patent bearing the broad title "Drive-In Theater."

The rejection was based on the ground of public use found by the tribunals of the Patent Office, as the result of an inquiry in a public use proceeding, to have occurred more than two years before appellant filed his application.[1]

Appellant's application has resulted in much controversy, phases of which have been passed upon by this court in two prior decisions.

The application, serial No. 301,713, was filed in the Patent Office October 28, 1939, and on February 27, 1940, an interference, No. 78,008, embracing a single count, was declared between it and an application "for Drive-In Theaters" of Samuel Herbert Taylor, Jr., which had been filed August 19, 1938.

The count which stemmed from claim 3 in the Taylor application was suggested to Josserand by the examiner and copied for the purpose of an interference.

Taylor, of course, was the senior party.

The count, which finally became claim 22 in the application now before us *ex parte*, read: "In a drive-in theater a plurality of inclined parking ramps for elevating the front ends of automobiles parked in said theater, a plurality of inclined drive-over ramps merging with the higher portions of said parking ramps, and a plurality of driveways, each of said driveways merging with the lower portion of one of said drive-over ramps on one side thereof and with the lower portion of one of said parking ramps on the other side thereof."

After various preliminary motions and actions in the Patent Office, unnecessary to be recited here, testimony was taken on behalf of the respective parties, and the case was heard by the Board of Interference Examiners which, on January 16, 1942, rendered a decision awarding priority to the party Taylor. The party Josserand sought a rehearing, which was denied February 23, 1942, and on March 10, 1942, an appeal was taken to this court.

On July 6, 1943, we rendered our decision, in an opinion written by the late Associate Judge Charles S. Hatfield, reversing the decision of the board and awarding priority to the party Josserand. We held, in effect, that the weight of the evidence clearly established conception by him as early as July 5, 1934, with reduction to practice during the period from July 5, 1934, to July 25, 1934, by the construction of a so-called drive-in theater, corresponding to the count, on the beach outside the sea wall of the city of Galveston, Texas. Josserand v. Taylor, 138 F.2d 58, 31 C.C.P.A., Patents, 709. A petition for rehearing, duly filed by the party Taylor, was denied October 4, 1943, without opinion, and on October 13, 1943, the case with conventional mandate was returned to the jurisdiction of the Patent Office.

It may aid in clarifying the "background" situation pertaining to the case to state that the party Josserand, in his preliminary statement, dated March 25, 1940, alleged conception with disclosure to others on or about July 1, 1933, and claimed: " * * * That the invention was reduced to practice on or about the month of December, 1933 by the filing of an application for patent embodying the invention and that since that time actual theaters constructed in accordance with the invention have been made and used * * *."

Seemingly the application so referred to matured into a patent (No. 2,102,718) issued December 21, 1937, and Josserand sought to obtain a reissue of it by an application filed December 19, 1939.

1. Section 4886, R.S., 35 U.S.C.A. § 31, at the time Josserand's application was filed, prohibited the issuance of a patent for subject matter which had been in public use or on sale in the United States for more than two years prior to the filing of an application therefor. By an act of August 5, 1939, which became effective one year after its approval, the time was changed from two years to one year.

Also on May 3, 1940, after the interference had been declared on February 27, 1940, Josserand sought to have his reissue application substituted in the interference and, since he would thereby become the senior party, moved to shift the burden of proof to the party Taylor.

Had his efforts in this regard met with success, apparently he would have been entitled to constructive reduction to practice by the filing of the application, in December 1933, which matured into patent No. 2,102,-718, but the examiner held that neither the patent nor the reissue application disclosed the subject matter of the count, refused the motion to substitute, and denied the motion to shift the burden of proof.

Aside from the effort to secure substitution so made, Josserand made no effort to establish by evidence either conception or reduction to practice earlier than the dates awarded him by our decision in Josserand v. Taylor, supra, when the activities took place on the Galveston beach in July 1934.

No question of public use was suggested in the interference controversy, but in October 1943 the party Taylor, acting under Patent Office old Rule 11 (now embodied in new Rules 291 and 292, 35 U.S.C.A. Appendix), filed a petition to the Commissioner of Patents for the institution of public use proceedings.

The petition was opposed by the party Josserand and was referred to the Board of Interference Examiners which recommended that it be granted and referred it to the Primary Examiner, who fixed times for taking testimony.

Testimony was introduced by both Josserand and Taylor, and after the taking of testimony had been concluded the party Taylor, on March 4, 1946, filed in this court a petition that we reopen the interference case and change our decision of July 6, 1943, Josserand v. Taylor, supra, or, in the alternative, that we authorize the Patent Office to reopen it.

The petition alleged, in substance, that the party Josserand perpetrated a fraud upon this court in the interference proceeding as shown by the testimony taken in that proceeding when compared with, or supplemented by, that taken in the public use proceeding.

It should be distinctly understood that Taylor's petition filed with this court did not seek a ruling on the question of public use. The party Taylor, of course, could not derive any advantage for his application from a ruling that the structure had been in public use more than two years before he had filed his application. So obviously, he sought a public use proceeding in order to introduce evidence upon which, when taken in connection with the evidence presented in the interference proceeding, a finding of fraud might be predicated.

Also, it should be borne in mind that the petition of the party Taylor was not presented to any tribunal of the Patent Office, but was presented *de novo* to this court.

It appeared that action in the Patent Office under the mandate following our decision of July 6, 1943, in the interference proceeding had been suspended awaiting the outcome of the public use proceeding. So, the petition for reopening the interference controversy was set down for argument, and was heard by us, on the first day of our 1946-7 term — that is, on Monday, October 7, 1946.

Our decision, also written by the late Associate Judge Hatfield, denying the petition was rendered November 4, 1946, Josserand v. Taylor, 159 F.2d 249, 34 C.C.P.A., Patents, 824.

From the opinion we quote the following paragraphs:

" * * * The petition, although not so denominated, is in effect a bill of review or an application for leave to file a bill of review in the Patent Office, it being claimed that the party Josserand perpetrated a fraud upon this court in the interference proceeding in which priority of the invention, defined by the count in issue, was awarded to him.

\* \* \* \* \* \*

"We have given most careful consideration to the issues presented by counsel for appellee, in view of the seriousness of the charges presented, but are of opinion that

the record before us wholly fails to establish that appellant Josserand either 'confessed' or 'virtually confessed' that he committed a fraud on this court, or that he repudiated his testimony or that of his witnesses in the interference proceeding or that any fraud was committed by appellant Josserand as to any material issue in that proceeding. In so holding we are not unmindful of the rule that, if the court had any serious doubt as to whether appellant Josserand perpetrated a fraud, extrinsic or collateral to the issues determined in the interference case, or if the question of such fraud was difficult of ascertainment, it would be the duty of the court to grant appellee's application for leave to file a bill of review in the Patent Office.

"It should be understood that the issue of public use by the party Josserand of the invention defined by the count involved in the interference was not before us in the interference case, nor is it present in the instant proceeding, and that nothing that the court has stated in either decision should be considered as an expression of opinion of its views in regard to that issue."

Our decision denying the petition, accompanied by a copy of the opinion, was certified to the Commissioner of Patents December 12, 1946. Since the petition was presented to us, *de novo*, there was no occasion for the issuance of any mandate or order to the Patent Office, and none was issued.

We find in the record of the instant case a decision of the examiner under date of August 9, 1946, wherein proceeding *ex parte,* he rejected seven of the eighteen claims then embodied in Josserand's application on the ground of prior public use. It is stated therein, in substance, that the claims previously had been discussed by the examiner in a ruling made before or during the interference proceeding and that the rejection in the decision of August 9, 1946, was for the reasons set forth in that former discussion, or ruling.

It will be noted that the decision was rendered after our decision of July 6, 1946, refusing to reopen the interference case, but prior to our action in that respect being certified to the Patent Office on December 12, 1946.

Reference is made to it here in order that the history of the controversy may be understood, and particularly because the decision recites the first rejection made on the public use ground.

Consideration of Josserand's application *ex parte* seems to have been resumed May 23, 1947, and all the claims were finally rejected by the examiner October 27, 1947. Following this rejection, however, amendments were admitted for the purposes of appeal by which claims 1 to 21, inclusive, were cancelled and claims numbered 23 to 27, inclusive, were substituted, so that before the board claims numbered 22 to 27, inclusive, were involved. The Board of Appeals based its affirmance of the examiner's rejection upon the ground that the claims "are unpatentable to appellant by reason of the statutory bar of prior public use."

The appeal to this court followed and except as to a question growing out of an order made by the Commissioner of Patents, speaking through the Assistant Commissioner, on July 11, 1949, which we hereinafter discuss, the sole question brought before us by the reasons of appeal is that of public use.

The text of claim 22 of the application is identical with that of the sole count of the interference quoted, *supra,* and there is nothing in claims 23 to 27, inclusive, which differentiates them from claim 22, so far as the issue of public use is concerned.

At the time this controversy arose the pertinent portion of R.S. § 4886, 35 U.S. C.A. § 31, read: "Any person who has invented * * * any new and useful * * * manufacture, * * * or any new and useful improvements thereof, * * * not in public use or on sale in this country for more than two years prior to his application, * * * may * * * obtain a patent therefor."

Specifically, in order that Josserand may obtain the patent sought in this case, it must be found that a "Drive-In Theater" corresponding to the claims of his application had not been in public use nor

490

on sale in this country more than two years prior to the 28th day of October 1939—the day on which his application was filed in the Patent Office.

It was held by this court in the interference proceeding of Josserand v. Taylor, supra, that a structure conforming to the count there involved (to which all the claims now before us *ex parte* are similar in a patentable sense) was erected and reduced to practice on the beach outside the sea wall of Galveston, Texas, during the month of July 1934. So, the question of reduction to practice is *res judicata,* and cannot be collaterally attacked in this proceeding. In re Shimer, 69 F.2d 556, 21 C.C.P.A., Patents, 979, and cases therein cited.

Reduction to practice, therefore, occurred more than five years before the Josserand application was filed.

Public use, however, is not implied necessarily by reduction to practice. Indeed, it is generally true that actual reduction to practice (as distinguished from the constructive reduction to practice presumed from the filing of an application) takes place before the invention is committed to public use or offered for sale.

It is the contention on behalf of appellant here, in substance, that the public use made of the structure which it is claimed he invented was for the purpose of experimentation and that although it was properly urged in the interference proceeding in support of his claimed reduction to practice it may not be looked to in this proceeding as a factor indicating public use within the meaning of that statutory term.

It may be said at the outset that appellant's own testimony in the public use proceeding places an emphasis upon the matter of "experimentation" which was not present in his testimony given in the interference proceeding, but, aside from that, we must look to all the pertinent evidence in both proceedings and determine therefrom whether such experimentation as was carried on was engaged in for the purpose of perfecting the structure of the so-called drive-in theater, or engaged in for the purpose of experimentation as to what the public reaction to such an arrangement for entertainment would be.

It is proper to say at this point that Mr. A. H. Emenhiser, whose business relationship with appellant is hereinafter alluded to, during his testimony in the public use proceeding, after stating that "kids in Galveston had a free show" by entering from the ocean side of the theater which could not be "fenced off," declared: "But our whole purpose was not commercial at all; it was simply to get the public in and get their reaction, so that we could take it back to Mr. Dunn [with whom negotiations seem to have been in progress for the purpose of securing a lot in Houston, Texas, on which to erect a structure conforming to Josserand's plans] and say, 'There it is; it is either feasible or it isn't.' "

The exact date in July 1934 on which the reduction to practice of the Josserand structure occurred was not stated by us in our decision in the interference proceeding, Josserand v. Taylor, 138 F.2d 58, 31 C.C.P.A., Patents, 709, supra, nor was it stated in the proceeding growing out of Taylor's allegation of fraud, Josserand v. Taylor, 159 F.2d 249, 34 C.C.P.A., Patents, 824, supra. This failure was due to the fact that the record did not show the exact date.

There was introduced into both records, however, certain exhibits (first presented by Josserand in the interference proceeding and later by Taylor in the public use proceeding) that are of interest here.

The exhibit designated (in the interference proceeding) as "Josserand's Exhibit No. 4" consists of an item that appeared in The Galveston Daily News, Thursday, July 5, 1934, under the heading "Beach Theater" which read: "The formal opening of the Drive In Short Reel Theater, just off 6th and Boulevard, will be held at 8 o'clock tonight, according to A. H. Emenhiser, proprietor. Programs, featuring news reels, comedies, cartoons, screen novelties and short subjects of major producing companies will be held nightly between the hours of 8 and 12 o'clock, and Saturdays until 2 a. m."

The A. H. Emenhiser referred to, apparently, was either an actual or a prospective licensee of Josserand. The record is not entirely clear as to the exact relationship nor is that relationship of importance so far as the issue here is concerned. The interesting part of the item is contained in the last sentence, because that sentence clearly indicates that there was a readiness to open the theater to the public for the purposes for which theater structures primarily are designed and built—entertainment.

The exhibit designated (in the interference proceeding) as "Josserand's Exhibit No. 5" consists of an item, obviously an advertisement, which appeared in the same newspaper on Saturday, July 7, 1934. It read:

Driv-N-Theater
(East Beach)
Cartoons, Comedies
and
Screen Novelties
* * *
Prices
Car parking with all occupants 25c
Seats: Adults 10c: children 5c

Certainly by the advertisement so quoted there was an offer to sell to the public an admission to a structure, which under any reasonable construction of R.S. § 4886, supra, was the equivalent of placing a claimed invention on sale.

In our decision in the interference case, *supra,* it was recited, in substance, that all the equipment necessary to the operation of the plant as a "movie" theater had been installed and used. This equipment included mechanism for proper lighting of the screen, sound mechanism, etc. It also is in evidence that a "sound truck" was used "for advertising the theater"; that there was a "ticket office"; that there were ushers; that admission charges were collected from occupants of automobiles after they were parked on the ramps; and that there was parking space for automobiles when the occupants wished to leave the cars and occupy seats near the screen and in front of the ramps. It seems to have been quite complete, even though the entire space available for seats and ramps was not utilized. It certainly was capable of producing and did produce the operating and mechanical results sought to be obtained.

The evidence is not definite as to the exact number of nights the theater was operated, but it seems reasonably clear that it was operated with paying customers present on at least twenty nights. Seemingly, the last night was July 25, the structure being destroyed by a storm on the 26th and not rebuilt.

We think it obvious that, under the facts recited, a *prima facie* case of public use of the Josserand structure and selling it in the manner it was intended to be sold was made out, and that it was incumbent upon Josserand, or whoever the actual party in interest is, to overcome that *prima facie* case. Specifically, it was required that it be shown affirmatively that the commercial use which has been related was necessary to demonstrate how the invention might be perfected within the limitations of the claims. The burden of showing this, of course, rested upon appellant, although from the brief filed on his behalf it would appear to be thought by his counsel that the Patent Office had the burden of showing the contrary.

We do not find in the voluminous record before us any evidence which, in our opinion, is sufficient to meet the burden so resting upon appellant.

It is true that after the ramps, which were made of sand, had been used or played over by children, it frequently was necessary to repair them by regrading, but this, of course, was merely a restoration of the original condition of the ramps, the proper arrangement of which within the limitations of the claims had been determined before any commercial use of the structure had been made.

In the case of Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 264, 8 S.Ct. 122, 130, 31 L.Ed. 141, the Supreme Court of the United States declared: "In considering the evidence as to the alleged prior use for more than two years of an invention, which, if established, will have the effect of invalidating the patent, and where the

defense is met only by the allegation that the use was not a public use in the sense of the statute, because it was for the purpose of perfecting an incomplete invention by tests and experiments, the proof, on the part of the patentee, the period covered by the use having been clearly established, should be full, unequivocal, and convincing."

In that same case it was said also:

"In the present case, the use of the machine was apparently for the purpose of conducting an established business; * *. * * * That it was capable of improvement need not be denied, nor that, while it was in daily use, its owner and inventor watched it with the view of devising means to meet and overcome imperfections in its operation; but this much can be said in every such case.

\* \* \* \* \* \*

"The proof falls far short of establishing that the main purpose in view, in the use of the machine by the patentee, prior to his application, was to perfect its mechanism and improve its operation. On the contrary, it seems to us that it shows that the real purpose in the use was to conduct the business of the manufacture; the improvement and perfection of the machine being merely incidental and subsidiary."

It was held by this court in the case of In re Bertram, 88 F.2d 834, 837, 24 C.C. P.A., Patents, 1073, in effect, that a use "mainly for the purposes of trade and profit" may not be considered experimental.

Similar holdings were made by the United States Circuit Court of Appeals, Eight Circuit, in the case of Twyman v. Radiant Glass Co., 56 F.2d 119; by the United States Circuit Court of Appeals, Second Circuit, in the case of Aerovox Corporation v. Polymet Manufacturing Corporation, 67 F.2d 860; and by the United States Circuit Court of Appeals, First Circuit, in the case of National Biscuit Co. v. Crown Baking Co., 105 F.2d 422.

One question in the case of Greenewalt v. Stanley Company of America, decision of which by the United States Circuit Court of Appeals, Third Circuit, is reported in 54 F.2d 195, in some respects parallels the question here involved. As stated in the brief of the Solicitor for the Patent Office before us: " * * * In that case there had been public exhibitions in a theater, for pay, involving an alleged invention, without any suggestion of an intent to experiment. It was held that 'against such business transactions, a secret purpose to test the invention, presently existing or later arising in the mind of the inventor,' could not establish that the use was experimental."

In the case of Union Carbide Co. v. American Carbide Co., 172 F. 120, the Circuit Court, Northern District of New York, held, as epitomized in a headnote of its opinion: "An experimental use of a new invention or discovery, which will not defeat the right of the inventor to a patent unless application is made within two years, must have been in perfecting the invention, and where the discoverer of a new form of calcium carbide, who made a considerable quantity, used the same in experiments in making acetylene gas, etc., not for the purpose of perfecting it, but to demonstrate its commercial value, * * such use constituted a public use or disclosure within the meaning of the law."

The court decision principally relied upon by appellant is that of the Supreme Court of the United States in the patent infringement case of City of Elizabeth v. Pavement Co., reported in 97 U.S. 126, 24 L.Ed. 100.

The patent involved was described in the Court's decision in part as follows: " * * a patent issued to Samuel Nicholson, dated Aug. 20, 1867, for a new and improved wooden pavement, being a second reissue of a patent issued to said Nicholson Aug. 8, 1854. The reissued patent was extended in 1868 for a further term of seven years. A copy of it is appended to the bill; and, in the specification, it is declared that the nature and object of the invention consists in providing a process or mode of constructing wooden block pavements upon a foundation along a street or roadway with facility, cheapness, and accuracy, and also in the creation and construction of such a wooden pavement as shall be comparatively

permanent and durable, by so uniting and combining all its parts, both superstructure and foundation, as to provide against the slipping of the horses' feet, against noise, against unequal wear, and against rot and consequent sinking away from below."

Elsewhere in the Court's opinion it was said: " * * * Nicholson's invention dates back as early as 1847 or 1848. He filed a *caveat* in the Patent Office, [a practice then common but not now authorized] in August, 1847, in which the checkerboard pavement is fully described; and he constructed a small patch of pavement of both kinds, by way of experiment, in June or July, 1848, in a street near Boston, which comprised all the peculiarities afterwards described in his patent; and the experiment was a successful one."

It appears that a contract was entered into whereby a concern by the name of New Jersey Wood-Paving Company was employed to construct streets in the city of Elizabeth, New Jersey, and it was discovered that in constructing them the paving company followed the method described in the Nicholson patent.

In the answer to the infringement suit brought by the American Nicholson Pavement Company, owner of the Samuel Nicholson patent, one of the defenses pleaded was that of "public use" based upon the use which had been made of the "small patch of pavement" built, in 1848, in a street, which at one place in the Supreme Court's opinion is referred to as "Mill-dam Avenue in Boston."

We quote the following additional statement from the Supreme Court's opinion: " * * * The road in which it was put down, though a public road, belonged to the Boston and Roxbury Mill Corporation, which received toll for its use; and Nicholson was a stockholder and treasurer of the corporation. The pavement in question was about seventy-five feet in length, and was laid adjoining to the toll-gate and in front of the toll-house. It was constructed by Nicholson at his own expense, and was placed by him where it was, in order to see the effect upon it of heavily loaded wagons, and of varied and constant use; and also

to ascertain its durability, and liability to decay."

It was held, in effect, by the United States Circuit Court for the District of New Jersey, American Nicholson Pavement Co. v. City of Elizabeth, 1 Fed.Cas. No.311, that the use made by the public of the section of road built by Nicholson was solely for experimental purposes—specifically for the purpose of testing its utility in various non-commercial respects—and for the purpose of obtaining an idea as to its lasting qualities, and that its use for such purposes by the public did not render it a "public use" within the meaning of that phrase as used in the statute.

The Supreme Court affirmed that decision, stating the reasons for its holding in an elaborate opinion, in the course of which it was said: " * * * Any attempt to use it [a claimed invention] for a profit, and not by way of experiment, for a longer period than two years before the application, would deprive the inventor of his right to a patent."

So far as we can determine from a study of all the judicial decisions found, the thought so expressed has been regarded uniformly by all courts, which have had occasion to pass upon the question, as a correct statement of the law.

No intelligent conclusion can be reached upon a question of public use without taking into account the purpose intended to be served by the invention claimed.

The purpose which the structure involved in the Nicholson patent was designed to serve of necessity required severe tests over a considerable period of time in order to ascertain whether it had any worthwhile utility, and there was never any attempt to use it *per se* for a profit during the testing period.

Appellant's structure did not require any severe tests extending over any considerable period of time in order to determine that it was sufficient for the purpose for which it was designed, and such tests as were requisite to disclose that obviously were made before it sought the patronage of the public—that is, sought to have the public pay for admission to the show.

When admission was charged, the use clearly became a commercial one, or, in other words, it was an attempt to use it for profit. The experimentation in this regard was indulged to see if public patronage could be attracted—not for the purpose of testing the structure.

■ Reference has been made hereinbefore to a holding on July 11, 1949, by the Assistant Commissioner of Patents. It was in response to a motion that the commissioner strike from the files of the Patent Office the here involved application of Josserand.

The motion was filed by attorneys acting for Samuel Herbert Taylor, Jr. who, as related, *supra*, was a party to the interference proceeding, our decision in which is reported in 138 F.2d 58, 31 C.C.P.A., Patents, 709, and who sought a reopening of the interference case alleging that Josserand had committed perjury and had perpetrated a fraud upon the Patent Office and the court, as recited in our decision denying the petition to reopen, reported in 159 F.2d 249, 34 C.C.P.A., Patents, 824. Also, by petition, he brought about the public use proceeding in the Patent Office, which is the occasion of our instant decision.

Taylor's motion that the commissioner strike the application apparently was based substantially upon the same allegations of perjury and fraud as those made in the petition to us to reopen the interference case. It was filed in the Patent Office February 23, 1949. This was two years and two and a half months after a copy of our decision denying the petition to reopen had been certified to the Patent Office. Evidently, the Assistant Commissioner failed to see the copy so certified, or was not impressed by it, because after quoting from the records in the interference and public use proceedings, he, on July 11, 1949, entered an order saying that a *prima facie* case of fraud on the part of Josserand had been established and declared: "For the reasons above stated, notice is hereby given that the above-entitled application will be stricken from the files of this Office unless the applicant shall, on or before September 6, 1949, show good and sufficient cause why such action should not be taken."

The decision of the Board of Appeals in the instant case involving only the question of public use was rendered June 1, 1949, and the appeal from its decision to this court was perfected July 19, 1949.

So, the order of the Assistant Commissioner on Taylor's motion to strike came in between the decision of the board and the appeal to us. We are without official information as to what has been done in the Patent Office since the Assistant Commissioner elected to disregard our decision of November 4, 1946, and have a fraud proceeding begin again at Taylor's instance.

In the reasons of appeal accompanying the instant appeal to us error is assigned respecting the foregoing action of the Assistant Commissioner. As a matter of fact, each of the reasons of appeal in the record begin with the phrase "The Patent Office erred," which is not in good form. Appeals come to us from specific tribunals of the Patent Office named by statute.

In view of the decision in the instant case the question of fraud possibly may be regarded as moot, but however that may be, we do not regard this court as having jurisdiction to pass upon the Assistant Commissioner's order to show cause. If any action has been taken and completed upon it so as to render it appealable to this court, the record does not show it.

For the reasons stated, the decision of the Board of Appeals affirming that of the examiner, denying patentability on the ground of public use, is affirmed.

Affirmed.

WORLEY, J., did not participate in the hearing or in the decision of this case.

O'CONNELL, Judge (specially concurring).

The three occasions upon which this litigation has come before us has found me in accord with the decision of the court. When the judgment is entered in the instant case, there shall have been rendered in the current litigation three unmodified judgments in each of which the right, question or fact involved was distinctly put in issue and directly determined by the court as a ground of recovery.

The effect of the judgment in the present case is to deprive the inventor Josserand of his patent and thereby cause his invention to revert to the public domain for the unrestricted use of anyone who may care to employ it.[1]

In the orderly course of procedure, and in the public interest, this prolific litigation should be brought to a final conclusion when the court, pursuant to R.S. § 4914, 35 U.S.C.A. § 62, "shall return to the commissioner a certificate of its proceedings and decision, which shall be entered of record in the Patent Office, and shall govern the further proceedings in the case." This court and other federal courts, however, as well as the tribunals of the Patent Office, are nevertheless confronted with the definite prospect of continuous, voluminous, and repetitious litigation.

That situation has been fostered by the action of Assistant Commissioner of Patents, Murphy, sitting in judgment as the Commissioner of Patents, whereby he has attempted to overrule and set aside the prior judgment of this court[2] which explicitly held that the evidence submitted there wholly failed to· establish that appellant· had committed a fraud upon the court, or committed any fraud whatsoever, as to any material issue in the prior interference proceeding which would warrant either the court or the tribunals of the Patent Office to reopen the previous interference[3] on the ground of alleged fraud on the part of appellant.

A copy of Taylor's petition to strike appellant's patent application from the records of the Patent Office, and appellant's opposition thereto, are reported in the documents before the court, together with the commissioner's resultant order to show cause why that should not be done. Those papers disclose the commissioner was confronted with the prior decision of this court, involving the issue of Josserand's alleged fraud, and that the commissioner issued his order with full knowledge of precisely what this court had previously decided.

The commissioner was governed by the judgment of our court, whether or not he had been an actual party to the proceedings upon which that judgment was rendered.[4] That judgment was res judicata not only as to Taylor, a party to the prior action, but also as to the Commissioner of Patents and the tribunals of the Patent Office.[5]

Res judicata seeks to bring litigation to an end and promote certainty in legal relations.[6] "Its enforcement," as defined in Southern Pacific Railroad Company v. United States, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355, "is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked * * * if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue, and actually determined by them." See also Commissioner of Internal Rev. v. Sunnen, 333 U.S. 591, 597–598, 68 S.Ct. 715, 92 L.Ed. 898.

Whenever the judgment in the former suit remains unmodified, that judgment is effective as an estoppel on the points decided there, whether the judgment was

---

1. Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; In re Bertram, 88 F.2d 834, 24 C.C.P.A., Patents, 1073; Union Carbide Co. v. American Carbide Co., C.C., 172 F. 120.

2. Josserand v. Taylor, 159 F.2d 249, 34 C.C.P.A., Patents 824.

3. Josserand v. Taylor, 138 F.2d 58, 31 C.C.P.A., Patents, 709.

4. In re Drawbaugh, 9 App.D.C. 219; Plough, Inc., v. Intercity Oil Co., D.C., 26 F.Supp. 978; Coca-Cola Co. v. Santa Cola Co., 85 U.S.P.Q. 426.

5. Winkelmann v. Calvert, 154 F.2d 1012, 33 C.C.P.A., Patents, 1206; In re Shimer, 69 F.2d 556; 21 C.C.P.A., Patents, 979; In re Marconi, 38 App.D.C. 286, 293; Blackford v. Wilder, 28 App.D.C. 535; Daniels v. Coe, 73 App.D.C. 54, 116 F.2d 941; Hemphill Co. v. Coe, 74 App.D.C. 123, 121 F.2d 897.

6. United States v. Munsingwear, Inc., 340 U.S. 36, 38, 71 S.Ct. 104.

right or wrong.[7] Moreover, R.S. § 4914, as hereinbefore described, specifically provides that the proceedings and decision of this court shall be entered of record in the Patent Office, and *shall govern the further proceedings in the case.*

Res judicata in the instant case has been successfully invoked by the Solicitor for the Patent Office against the appellant with respect to our judgment in the first of the three cases. By the same authorities upon which the solicitor relied, the Patent Office was likewise bound by the judgment of this court in the second of the three cases. As correctly stated in Re Marconi, 38 App.D.C. 286, 293, with respect to the operation of res judicata, or estoppel by former judgment: "There should be an end to litigation in the Patent Office as elsewhere, and the principle of *res judicata* is applied therein to its full extent." [8]

Appellant has here submitted four valid reasons of appeal directed to the issue, for example, that

"21. The Patent Office erred in placing the Appellant Josserand herein under an order to show cause, returnable September 6, 1949, as to why the Josserand application for patent involved in this ex parte appeal should not be stricken from the Patent Office files for alleged fraud in the Interference and Public Use Records, which records are the same as those considered heretofore by this Court which found that such record 'wholly fails to establish * * * that any fraud was committed by Appellant Josserand as to any material issue in that proceeding.'

"22. The Patent Office by the Assistant Commissioner Murphy erred in usurping the jurisdiction of this Court in an attempt to re-open the question of alleged fraud which this Court had previously disposed of in a petition to this Court to reopen which was based on the self-same record as between the same parties."

Res judicata as usually applied bars subsequent consideration not only of those matters which were distinctly put in issue and directly determined but also of those matters which could have been raised and determined in the prior action. Because of the public interest, however, res judicata, or estoppel by former judgment, operates against the Commissioner of Patents, and his tribunals of the Patent Office, only as to the point or issues actually litigated and determined, and not as to other matters which might have been so litigated and determined.[9]

The action of the commissioner in setting aside our judgment in the second case, and with the view of reopening our judgment in the first case, appears to have been nowise based upon the public interest. If the judgment in the first case, awarding priority of invention to Josserand, is also to be set aside by the commissioner when the instant case reverts to the Patent Office, thereby restoring its jurisdiction, additional litigation stands to be instituted with the view of taking the invention from the public and restoring it to Taylor as the original inventor.

The Government service has not been totally devoid of those who considered themselves above the law and the courts which construe and enforce it. Such administrators, on occasion, have exceeded their authority [10] or have slept on the job when the predominant rights of the public should have been vigorously asserted.[11] The Supreme Court has recently curbed

7. Reed v. Allen, 286 U.S. 191, 52 S.Ct. 532, 76 L.Ed. 1054; United States v. Boone, 188 F.2d 808, 38 C.C.P.A., Customs, 89, decided Feb. 6, 1951.

8. To the same effect see Lavin v. Pierotti, 129 F.2d 883, 29 C.C.P.A., Patents, 1235.

9. Krasnow et al. v. Bender, 170 F.2d 560, 36 C.C.P.A., Patents, 723, 728; Blackford v. Wilder, 28 App.D.C. 535.

10. McCoy v. Pfeiffer, 133 F.2d 913, 30 C.C.P.A., Patents, 853.

11. The tribunals of the Patent Office could have rejected the appellant's application, ex parte, and without reference to the issues raised by the parties, upon the evidence produced before them in the original interference proceeding, which was the same then as it is here. Heuberger

one such agency which considered that because it had a certain guardianship of the public interest, it was at liberty to disregard and override the rule of res judicata which is of universal application.[12]

Volume 30, American Jurisprudence, sec. 174, reads: "In the application of the doctrine of res adjudicata if it is doubtful whether a second action is for the same cause of action as the first, the test generally applied is to consider the identity of facts essential to their maintenance, or whether the same evidence would sustain both. If the same facts of evidence would sustain both, the two actions are considered the same within the rule that the judgment in the former is a bar to the subsequent action."

On the same issue, and in the same publication, see sections 175, 176, and 178. See also 34 Corpus Juris, 743, 744; 88 A.L. R. 575; Bittner et al. v. West Virginia-Pittsburgh Coal Co., 4 Cir., 15 F.2d 652, 655.

There is no question that had appellant elected to proceed under R.S. § 4911, 35 U.S.C.A. § 59a, by way of remedy in a court of equity, with respect to the ancillary issue presented by appellant's reasons of appeal hereinbefore described, a writ of mandamus could be there petitioned for to compel the commissioner to vacate the proceedings affecting the appellant's rights under our previous judgment in the second case.[13] The Solicitor for the Patent Office contends, however, that: "The appellant appears to be requesting the Court to set aside the action of the Commissioner in calling upon the appellant to show cause why his application should not be stricken from the files because of fraud. It is respectfully submitted that this Court has no jurisdiction in that matter, first because its jurisdiction in patent cases is limited to review of de-

cisions by the Board of Appeals and secondly because no final action has been taken by the Commissioner. If the appellant feels that the Commissioner has acted outside his authority his remedy is by petition to the United States District Court for a mandatory injunction."

The solicitor, it is noted, has cited no authority whatever in support of his contention. On the other hand, appellant properly contends in his brief that one of the ways to plead res judicata is, as he has done here, by way of affirmative defense in an action at law, such as we have here, and not by injunction or mandamus in the original proceeding, citing Pioneer Pyramid Life Ins. Co. v. Hughey, 4 Cir., 76 F.2d 524, 526, to the following effect:

"An estoppel based upon the principle of res judicata is asserted, not by injunction in the original cause, but by defensive pleading in the action to which the defense is applicable. 15 R.C.L. 1045. And it is well settled that where the remedy at law is plain, adequate, and complete, resort to equity is not permissible. 28 U.S.C.A. § 384; Enelow v. N[ew] Y[ork] Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440. * * *"

Volume 34, Corpus Juris, 749, also states: "While the doctrine of res judicata is usually regarded as a defense, it is equally available to plaintiff where the circumstances warrant it, either by pleading it as an element of his cause of action or in reply to defendant's answer, * * * or, where no opportunity for this is afforded, by introducing evidence of the former adjudication".

It would appear therefore that the contention of the Solicitor for the Patent Office must be taken with a grain of salt. In any event, the court of its own motion may raise the question of res judicata,

---

v. Becker, 107 F.2d 601, 27 C.C.P.A., Patents, 746; Derby et al. v. Whitworth, 62 F.2d 368, 20 C.C.P.A., Patents, 791; In re Bertram, 88 F.2d 834, 24 C.C.P.A., Patents, 1073; Burmel Handkerchief Corp. v. Cluett, Peabody & Co., Inc., 127 F.2d 318, 29 C.C.P.A., Patents, 1024.

12. United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, affirming, 8 Cir., 178 F.2d 204.

13. United States ex rel. Newcomb Motor Co. v. Moore, 30 App.D.C. 464, 476.

which goes to the jurisdiction of the court, at any stage of the proceedings.[14]

Moreover, there can be no question that this court has inherent power to issue a citation for contempt with respect to the deliberate violation of the judgment of the court on the part of a subordinate official, nor can the court's inherent right be challenged to issue a mandate directing that such official withdraw a pending order made by him invalidating a prior judgment of the court in the current litigation, so long as the court retains control of the subject matter and of the parties.

In the final disposition of the instant case, the court should issue an order so as to relieve appellant of the necessity of resorting to all the technical apparatus of procedure, with which the court and litigants are familiar, so as to correct an anomalous and unjust situation in the Patent Office, which the court has learned .from the record exists there in connection with the present litigation. That procedure will be a short cut to justice, and put an end to this prolific litigation.

14. Northern Pacific Railroad Co. v. Ellis, 144 U.S. 458, 464, 12 S.Ct. 724, 36 L.Ed. 504; Macleay Duff (Distillers), Ltd. v. Frankfort Distilleries, Inc., 129 F.2d 695, 29 C.C.P.A., Patents, 1160.